TERRELL, Comptroller, v. MIDDLETON.*

(Supreme Court of Texas. Feb. 20, 1917.)

Error to Court of Civil Appeals of Third Supreme Judicial District.

Suit by W. C. Middleton against H. B. Terrell, Comptroller. Decree for complainant was affirmed by the Court of Civil Appeals (187 S. W. 367), and defendant applies for writ of error. Writ of error denied.

PER CURIAM. Application for writ of error refused January 10, 1917.

*Rehearing denied. See 193 S. W. 139.

HAWKINS, J. (concurring). By a mere order and without any written opinion, on January 10, 1917, the Supreme Court refused the application of the comptroller of public accounts for a writ of error in this case. In that order I concurred; but therein I made a notation of my intention to prepare and file a statement of my own views on the law of this case.

What is the legal effect of an order of the Supreme Court refusing a writ of error? Upon that point, and even among lawyers, there is quite a divergence of opinion. The correct answer depends, ordinarily, upon whether, in the particular case, the essential questions of law have been fully presented in the application for writ of error.

Such answer is therefore twofold, and it is as follows:

(1) If the essential questions have been duly preserved and presented through all the courts, refusal of the writ of error means, ordinarily, that, in the opinion of the Supreme Court, the decision made and the judgment entered by the Court of Civil Appeals are, substantially, sound and correct, and therefore should not be disturbed. But, as a matter of fact, it frequently happens, in such cases, that the order refusing the writ really is based upon some ground entirely different from those stated in the opinion of the Court of Civil Appeals as the basis of its decision and judgment. Concerning cases falling within this first class, the Supreme Court, through Judge Gaines, said:

"In rejecting an application for a writ of error, we approve the result of the case as determined by the Court of Civil Appeals, but do not necessarily adopt the opinion." Fleming v. Loan Agency, 87 Tex. 238, 27 S. W. 126, 26 L. R. A. 250.

To the same effect is the following, also from this court, through Chief Justice Stayton, in an earlier case:

"When application for writ of error, showing a case in which this court has jurisdiction, is made, all the questions presented by it are carefully considered, under the light of such arguments as may be filed; and, when in such cases an application is refused, this is in effect a decision by this court that the decision of the Court of Civil Appeals is correct in its result, and ordinarily opinions in writing are not given in overruling such an application, even though we may not concur in all the reasoning through which the conclusion of the court is reached." Brackenridge v. Cobb, 85 Tex. 448, 21 S. W. 1034.

(2) But, on the contrary, if, although the decision and judgment of the Court of Civil Appeals are plainly erroneous, the applicant for the writ of error is not in position to complain—as, for instance, where the point of error is not raised in the application to the Supreme Court for a writ of error, or was not presented to the Court of Civil Appeals in a motion for a rehearing as required by Rule 1c (159 S. W. viii)—refusal of the writ means, ordinarily, no more than that such point of error has been waived by the applicant, and therefore cannot be considered further by the Supreme Court.

The truth is that in no instance does a refusal by the Supreme Court of a writ of error necessarily or conclusively carry an approval by that court of the opinion of the Court of Civil Appeals, or even of any one or more of the grounds or reasons given in its opinion in support of its decision and judgment; and, in numerous instances, refusal of the writ of error results from failure of counsel to present, at all to the Supreme Court, or to preserve, bring up, and present there in even substantial accordance with established rules of practice, some one or more vital and controlling issues, upon which, but for such failure, the Supreme Court, doubtless, would grant the writ of error, and ultimately, upon submission of the cause, reverse the decision and judgment of the Court of Civil Appeals.

Consequently, there being in said order refusing the writ of error in this case nothing whatever stating or indicating the cause, or reasons or reason, which induced the Supreme Court to refuse the writ, said order of refusal, upon its face, and unless read in connection with the application, which does not go into our court reports, amounts to nothing more than a peremptory refusal, for some good reasons or reason, not indicated by the Supreme Court, to disturb the decision and judgment of the Court of Civil Appeals; and such reason, presumably at least, may involve nothing more serious than some failure upon the part of counsel for the applicant to comply, substantially, with some rule of practice in the courts.

Furthermore, from what has been said above, it follows that even when said order refusing the writ of error in this case is read in connection with, and in the light of, the entire application for the writ, and the briefs of both parties, and the record in this case, and the opinion of the Court of Civil Appeals, the utmost legal effect of such order of refusal of said writ is to declare that, in the unanimous opinion of the Supreme Court, there is at least one good and sufficient legal reason, whether stated by the Court of Civil Appeals in its opinion or not, upon which the decision and judgment of the Court of Civil Appeals should be assumed to rest, and that, consequently, said decision and judgment should be left undisturbed.

Unquestionably, said order of the Supreme Court refusing the writ of error in this case leaves in full and binding force and effect the decision and judgment of the Court of Civil Appeals perpetuating the injunction against the payment of all claims against the state which are involved in this appeal; but it is, likewise, absolutely certain that in no reasonable view of the matter can said order of refusal by the Supreme Court in this case fairly be said to indicate approval of the opinion of the Court of Civil Appeals, as a whole, or of any particular ground or reason set forth therein in support of said decision

and judgment of that court, or to indicate that any particular claim against the state involved in this appeal is obnoxious to any particular section of the Constitution of Texas, or to indicate whether the hereinafter quoted statute, article 4342, which purports to authorize the Governor to allow and approve "deficiencies," is, in whole or in part, valid or unconstitutional.

It is too plain to be denied that said order refusing the writ of error in this case utterly and wholly fails to indicate the opinion or views of the Supreme Court, or of any member thereof, concerning the validity of all or any part of article 4342, or concerning the legal effect of any particular section of said Constitution upon any of said claims against the state. In short, the action of the Supreme Court, and the only order made by it, leaves every material issue in this case in nubibus, in so far as the opinion and views of this court of last resort, and of its members, are concerned. With that, for my own part, I cannot rest content. The record, briefs, and printed arguments in this case, and its public history, alike establish the facts that while the primary purpose of this suit was to restrain, by injunction, the issuance of state treasury warrants in final payment of certain claims against the state, the ultimate, and broader, and more enduring purpose of the action was to obtain from the courts, including this court of last resort, a definite opinion disclosing and declaring the real bearing and legal effect upon items of expense such as those involved in this case, of, first, not merely some, but all, applicable provisions of the Constitution of Texas, and, second, the provisions of R. S. art. 4342, relating to the "allowance" of "deficiency appropriations," and payment thereunder; and that opinion was sought, with reference to, (a) ordinary biennial appropriations, and (b) "deficiency allowances" and "deficiency appropriations."

A careful consideration of the issues presented, and of the opinion of the Court of Civil Appeals for the Fourth Supreme Judicial District, by Chief Justice Fly (187 S. W. 367), rendered June 14, 1916, has impressed very strongly upon my mind these thoughts:

First. The decision of the Court of Civil Appeals perpetuating the injunction granted by the district court, restraining the issuance of state treasury warrants for actual payment by the state of each and all of the items of expense which are involved in this appeal, unquestionably is sound, and said opinion of Judge Fly (excepting, possibly, one or two remarks which are unimportant in so far as the decision of this case is concerned) constitutes an able and unanswerable exposition of the law of this case, as far as said opinion goes; but it does not fully cover the case, as I view it.

Second. Sound in principle and well settled by decisions of this court, and of other courts, is the proposition that the unconstitu-

tionality of an appropriation bill or other statute need not be pleaded, such question being inherent; and, as a corollary, when such question becomes material in a case before the court, it is the duty of that court to declare such appropriation bill or other statute unconstitutional, in whole or in part, as the case may be, whenever it discovers such unconstitutionality, whether the same has been pleaded or not; and that, of course, involves and applies to each applicable provision of the Constitution. Thompson v. Houston, 31 Tex. 610; Furman v. Nichol, 8 Wall. 44, 19 L. Ed. 370; Townes' Texas Pleading (2d Ed.) p. 397.

Third. This is a pioneer case. The questions involved in this appeal may affect, very materially, future financial operations of our state government, involving the expenditure, from year to year, of considerable sums of money from the state treasury, derived from taxation, some such expenditures to be made out of biennial "general appropriations," and some through "deficiency allowances" under R. S. art. 4342 sequor, to be paid out of some "deficiency appropriation" made in a lump sum, before, or to be made after, the "approval" by the Governor of such "deficiency allowance."

Consequently, a full expression by the appellate courts upon each of the questions of law raised in this appeal might prove to be of material assistance to the co-ordinate branches of the government, while failure to make such expression upon some branch of the case as presented by the appeal, or upon some applicable section of our Constitution, even though not relied upon by either party to the suit, might be misunderstood or misconstrued as holding, by implication at least, that some certain sound contention made in support of the prayer for injunction is without merit, or that such section of said Constitution does not inhibit such expenditures.

Under the circumstances of the case, and in accordance with the general practice of appellate courts in other states, and occasional but long-established precedents in this court in cases of far less importance than this case, it seems to me to be clear: (1) That all questions of law which are involved in this appeal should be both considered by the appellate courts and passed upon, explicitly, definitely, and expressly, in some written opinion; and (2) that the Supreme Court, as the court of last resort, should carefully ramify the whole subject, and make, in some form or fashion, by express adoption of the law of the case as set forth in the opinion of the Court of Civil Appeals, or otherwise, a plain and definite statement of its own views and opinion upon every issue in the case, thereby setting the entire matter permanently at rest. Why not?

It is true that, in cases involving two or more separately decisive issues, appellate courts frequently restrict the decision to only one or more such issues, pretermitting dis-

cussion of others; but it seems to me that to prevent (a) the necessity of recurring appeals of the same suit, and (b) a multiplicity of suits, the better practice, even ordinarily, time permitting, is to determine, once for all, every material question of law presented upon an appeal; and especially is that better practice applicable to this case because of its intrinsic, fundamental, far-reaching, and abiding importance in the transaction of the fiscal affairs of our state government.

It is true, also, as above indicated, that, generally, in refusing a writ of error, this court does not write upon the questions involved, but contents itself with a mere order of refusal, such as has been entered in this case, and such possibly implied affirmance of the result, in the particular case, announced therein by the Court of Civil Appeals, and without thereby approving, in terms, or even by necessary implication, the course of reasoning followed by that court, and without implying that such decision by the Court of Civil Appeals is not sustainable upon some ground or grounds other than those stated in its opinion in the case; but that rule rests mainly upon the idea of conserving the time of the Supreme Court, and to that rule, and even recently, and in cases of comparatively slight importance, there have been numerous exceptions.

For the reasons stated above, this case, as it reaches the Supreme Court, is, in my estimation, of such exceptional nature as to justify, if not require, a definite expression of the opinion and views of this court of last resort.

Just here it may not be inappropriate to say that, because of the general public importance of this case, the motion of the defendant in error to "advance" action of this court upon the application for a writ of error was granted, and that since the foregoing was written plaintiff in error has filed in this court his motion for a rehearing, containing, among other things, the following:

"The constitutional questions involved in this case have never before been presented to the courts of this state for determination. We have not been able to find where the precise question has come before any court. * * * The decision of the Court of Civil Appeals, in our judgment, is erroneous; but, if it should be held that that decision properly disposes of the case, the questions here involved are so important that they should be decided by the court of last resort as a guide to future Legislatures. It is quite evident that the Legislature construes the Constitution as authorizing the appropriation here sought to be held void. * * * Until a decision is handed down by this court fearlessly and fairly dealing with the law questions involved, as it deals with all questions coming before it, such appropriations, no doubt, will be continuously made. The Legislature and the people at large are entitled to have the sections of the Constitution involved construed by this court and the power of the Legislature defined for their future guidance in the event this court is of the opinion that the appropriations in controversy are invalid."

Entertaining, as I do, the ideas hereinabove stated by me, and impelled by a persistent sense of duty in the premises, and pursuant to my said notation in said order of this court refusing the writ of error, but speaking strictly for myself alone, I state, below, the essential facts, and record therewith my views concerning the law of this case.

Those views will, I trust, be found to be in harmony with my long entertained views concerning the legal effect of certain provisions of our state Constitution, as indicated by my dissenting opinion, filed in the year 1914, in Dallas County v. Lively, 106 Tex. 364, 167 S. W. 219, wherein this court held that a county commissioner's court legally may make an order increasing the salary of a county judge relate back to, and become operative from, a previous date.

The General Appropriation Bill passed by the Thirty-Third Legislature (General Laws 1913, 1 S. S.) carried, at page 113, the following items:

| "Mansion and Grounds | For the Years Ending Aug. 31, 1914. | Aug. 31, 1915. |
|---|---|---|
| For Governor's mansion, including repairs and remodeling of mansion, improvement of grounds surrounding the mansion, including repairs and improvements to mansion and grounds and the necessary labor to care for same, to be expended in two years.. | $12,000.00 | |
| Labor and employés at mansion ................;........ | 1,000.00 | $1,000.00 |
| Fuel, lights, water, ice, groceries and incidentals ...................... | 2,000.00 | 2,000.00 |
| Total ............... | $15,000.00 | $3,000.00 |

"The appropriations herein provided for the executive office and mansion grounds are to be construed as the maximum sums to be appropriated to and for the several purposes named herein, and no expenditures shall be made, nor shall any obligations be incurred which, added to the actual expenditures, will exceed the amounts herein appropriated for either of the said purposes, except under the provisions provided for in article 4342 of chapter two, title sixty-five, of the Revised Civil Statutes of 1911."

That statute is as follows:

"All heads of departments, managers of state institutions or other persons intrusted with the power or duty of contracting for supplies, or in any manner pledging the credit of the state for any deficiency that may arise under their management or control, shall, at least thirty days before such deficiency shall occur, make out a sworn estimate of the amount necessary to cover such deficiency until the meeting of the next Legislature; and such estimate shall be immediately filed with the Governor of the state, who shall thereupon carefully examine the same and approve or disapprove the same in whole or in part. When such deficiency claim, or any part thereof, has been so approved by the Governor he shall indorse his approval thereon, designating the amount and items thereof approved and the items disapproved, and file the same with the Comptroller; and the same shall be authority for the comptroller to draw his deficiency warrant for so much thereof as may be approved; but no claim, or any part thereof, shall be allowed or warrants drawn therefor by

the comptroller, or paid by the treasurer, unless such estimate has been so approved and filed. If there is a deficiency appropriation sufficient to meet such claim, then a warrant shall be drawn therefor and the same shall be paid; but, if there is no such appropriation, or if such appropriation be so exhausted that it is not sufficient to pay such deficiency claim, then a deficiency warrant shall issue therefor; and such claim shall remain unpaid until provision be made therefor at some session of the Legislature thereafter; provided, that the provisions of this section [article] shall not apply to fees and dues for which the state may be liable under the general laws; provided, further, when any injury or damage shall occur to any public property from flood, storm or any unavoidable cause, the estimate may be filed at once, but must be approved by the Governor as provided in this section [article]."

The above-quoted General Appropriation Act is not germane to any issue in this case, unless and except as it may serve as a predicate for the hereinafter mentioned "deficiency allowance" which was made by the Governor on December 14, 1914, and for the hereinafter mentioned "deficiency appropriation" of $1,-500 which was made by the Legislature "for the year ending August 31, 1915."

To supplement said general appropriation of $2,000 for "fuel, lights, water, ice, groceries and incidentals" for the year ending August 31, 1915, which, it was found, was about to become exhausted, there was made, approved by the Governor, and filed with the comptroller, on December 14, 1914, an estimate, or "application for an approved deficiency," of $1,500 for the payment of accounts against said $2,000 appropriation; and all that seems to have been done substantially in compliance with the requirements of article 4342.

Thereafter, and during the fiscal year ending August 31, 1915, said entire original "general appropriation" of $2,000 having been expended, the Governor who went out of office on January 19, 1915, and his successor, respectively, incurred certain expenses, as shown below, and for said items of expense, and in pursuance of the provisions of article 4342, and by reason of said "approved deficiency" of $1,500, the comptroller issued certain "deficiency warrants," which were not paid promptly because there happened to be then in the state treasury no money which had been appropriated for the purpose of paying allowed deficiencies. Those warrants were outstanding when this suit was filed.

After issuance of said "deficiency warrants," and, apparently, in part, at least, for their protection, the Thirty-Fourth Legislature, during its regular session, by "An act to make appropriations to cover authorized deficiencies, * * * for the year ending August 31, 1915" (Acts 1915, p. 13), made a "deficiency appropriation," as follows: "For Governor's Mansion: Water, fuel, lights, etc., $1,500.00." And thereon the main issue in this case must turn.

That act was approved February 12, 1915, and on that day Middleton, a citizen and tax-payer of this state, filed in the district court of Travis county, Fifty-Third Judicial district, this suit against Terrell, as comptroller of public accounts, for an injunction restraining him, generally, from issuing state treasury warrants against said "deficiency appropriation" of $1,500, in final payment of claims against the state of Texas, including those for which said outstanding "deficiency warrants" had been issued. As grounds for such injunction, the taxpayer alleged that such "deficiency appropriation" was "an attempt to increase the compensation of the Governor," and therefore was violative of section 5 of article 4 of the Constitution of Texas, hereinafter quoted. A temporary injunction, as prayed for, was granted, after which the action seems to have been narrowed to only the specific items of expense hereinafter enumerated.

As grounds for injunction, Middleton pleaded:

(1) That the specific items of expense complained of were not embraced by said items in said "deficiency appropriation" act of 1915, reading, "For Governor's Mansion: Water, fuel, lights, etc., $1,500.00."

(2) That said items of expense were for private and individual purposes, and not for the public good, and, even if embraced by said items in said "deficiency appropriation" act, are, nevertheless, in direct contravention of the following provisions of the Constitution of Texas:

(a) "He (meaning the Governor) shall, at stated times, receive as compensation for his services an annual salary of four thousand dollars, and no more, and shall have the use and occupation of the Governor's mansion, fixtures and furniture." Section 5 of article 4.

(b) "Taxes shall be levied and collected by general laws and for public purposes only." Section 3 of article 8.

(c) "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." Section 3 of article 1.

(d) "The Legislature shall provide by law for the compensation of all officers, servants, agents and public contractors, not provided for in this Constitution, but shall not grant * * * by appropriation or otherwise, any amount of money out of the treasury of the state, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law, nor employ anyone in the name of the state, unless authorized by pre-existing law." Section 44 of article 3.

(e) "The Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the government, in which may be included the following purposes: * * * The payment of all officers, agents and employés of the state government, and all incidental expenses connected therewith." Section 48 of article 3.

(f) "No debt shall be created by or on behalf of the state, except to supply casual deficiencies of revenue, * * * defend the state in war, or pay existing debt; and the debt created to supply deficiencies in the revenue shall never exceed, in the aggregate at any one time, two hundred thousand dollars." Section 49 of article 3.

(g) "The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the state in aid of, or to, any person, association or corporation whether municipal or other; or to pledge the credit of the state, in any manner whatsoever, for the payment of the liabilities, present or prospective, of any individual, association of individuals, municipal or other corporation whatsoever." Section 50 of article 3.

(h) "The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporation whatsoever." Section 51 of article 3.

(i) "No appropriation for private or individual purposes shall be made." Section 6 of article 16.

The comptroller excepted to the sufficiency of Middleton's petition, upon these grounds: (a) That the action of the Legislature, in holding said indebtedness legal and in providing for payment thereof, is not subject to review by the courts. (b) That, because Middleton has no interest in this suit other than as a taxpayer in common with others similarly situated, he cannot maintain this action. (c) That this suit is one against the state of Texas, which is not shown to have consented to be sued. (d) That the suit is not within the jurisdiction of the district court.

The comptroller further answered, averring, among other things, in substance: (1) That said expenses were incurred by the Governor, not for private, but for public, purposes; that all commodities and things purchased, as set forth in plaintiff's petition, were included in either the furniture or the fixtures of the mansion and grounds, or for fuel, light, water, ice, groceries, and incidentals for the Governor's mansion and grounds; that said general appropriation of $2,000 was made and exhausted, and that said "deficiency allowance" of $1,500 was approved by the Governor and filed with the comptroller, by authority of R. S. art. 4342, all as hereinabove stated; and that, consequently, all of the items of expense in controversy constituted valid indebtedness and legal claims against the state, and were so prior to the passage of said "deficiency appropriation" act approved February 12, 1915, appropriating said item of $1,500; that payment by the Legislature of said indebtedness is authorized by said provisions of section 49 of article 3 of our state Constitution; and that, unless restrained, he would issue state treasury warrants for the final payment of said items of expense in controversy. (2) That as matters of law, of custom, and of equity, the state should pay said items of expense. Thereupon Middleton pleaded that, if said article 4342 is to be construed as authorizing the incurring of said items of expense as debts against the state, that statute is void as contravening each of the foregoing provisions of said Constitution.

Upon the trial, which was without a jury, the district court dissolved said temporary injunction in part and perpetuated it in part.

The items of expense as to which the tem-porary injunction was dissolved were as follows: Four claims for water and light; one claim for gas heater, cooking vessels, and dishes; one claim for matting, carpets, and fixtures; one claim for cleaning flues; and two claims for telephone service. As to them no appeal was taken.

The items of expense as to which the injunction was so perpetuated, and appeal taken, were as follows:

| | |
|---|---:|
| 1-16-1915 Driskill Hotel, punch | $ 76.50 |
| 1-16-1915 Driskill Hotel, chicken salad, olives, saratoga flakes, almonds and cases, coffee, mints, sugar, lettuce, waiters, cooks and helpers | 152.40 |
| 1-18-1915 Tobin's Book Store, invitations, correspondence cards, envelopes | 53.50 |
| 12- 3-1914 Achilles & Co., groceries | 98.90 |
| 1-16-1915 Maerki's Bakery, groceries | 14.20 |
| 1-17-1915 Excelsior Meat Market, meats, etc. | 12.00 |
| 1-11-1915 Bryant Bros., horseshoeing | 2.50 |
| 12- 1-1914 W. J. Forster, dealer in fruits and vegetables, character of articles not stated | 13.00 |
| 1- 1-1915 W. J. Forster, character of articles not stated | 15.05 |
| 2- 1-1915 Consumers' Fuel & Ice Co., coal furnished Governor's mansion in January | 21.25 |
| 2- 1-1915 W. J. Forster, "at different dates from January 18th to 30th, inclusive," character of articles not stated | 5.70 |
| Total | $465.90 |

The foregoing claims, it seems, were the only ones for which deficiency warrants had been issued against said "deficiency allowance" of $1,500. Plaintiff's amended petition prayed that payment of all those claims be restrained by injunction.

From so much of said judgment of the district court as perpetuated said injunction as to said designated items of expense the comptroller appealed to the Court of Civil Appeals for the Third Supreme Judicial District, from which, in equalizing the dockets, the cause was transferred to the Court of Civil Appeals for the Fourth District, at San Antonio, and that court decided the case against him; whereupon, after his motion for a rehearing had been overruled, he filed said application to the Supreme Court for a writ of error, which application was overruled, as above stated.

The Court of Civil Appeals held, in substance:

(1) That a taxpaying citizen may maintain a suit to restrain a state officer from performing illegal, unauthorized, and unconstitutional acts, such as issuing state treasury warrants calling for the illegal disbursement of state funds, thereby increasing said taxpayer's burdens.

The holding was correct. City of Austin v. McCall, 95 Tex. 565, 68 S. W. 791; Crampton v. Zabriskie, 101 U. S. 609, 25 L. Ed. 1070; Bryant v. Logan, 56 W. Va. 141, 49 S. E. 21, 3 Ann. Cas. 1014.

(2) That when a state officer acts, in such instances, without legal authority, he is not

acting for or in the interests of the state, and a suit like this, against him, is not, in effect, a suit against the state.

That holding is undoubtedly sound, on principle and on authority. United States v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171; Osborn v. Bank, 9 Wheat. 738, 6 L. Ed. 204; Conley v. Daughters of the Republic, 106 Tex. 80, 156 S. W. 197, 157 S. W. 937; Id., 151 S. W. 877. The question is treated exhaustively in decisions cited in briefs in Stephens v. T. & P. Ry., 100 Tex. 177, 97 S. W. 309, involving the Railway Gross Receipts Tax Act of 1905 (Acts 29th Leg. c. 141).

(3) That the district court has jurisdiction over a suit of this character, the action being, not in the nature of a mandamus, to compel performance of public duty, but for injunction, to restrain performance of an act which is inhibited by our state Constitution. •

That the proposition is sound is too clear for argument, and to that effect are the decisions in previous cases. Const. of Tex. art. 5, § 8; R. S. 4643; Kaufman County v. McGaughey, 3 Tex. Civ. App. 655, 21 S. W. 261; Sterrett v. Gibson (Civ. App.) 168 S. W. 16.

(4) That even though the Legislature may have recognized the claims or expenses in question as valid claims against the state, and appropriated money with which to pay them, such legislative action is not conclusive or binding upon the courts, and will not deter them from holding such appropriation unconstitutional and void, and restraining issuance of state treasury warrants in payment of such claims.

The contention of the comptroller upon that point is absurd, because, necessarily, it rests upon the view that, whenever there is a clash between a statute enacted by the Legislature and the Constitution of Texas, the latter must yield to the former. The practical effect would be to make the will of the Legislature, each member of which is required to take an oath to support the Constitution, superior to the will of the entire people as plainly expressed in ˙ their social compact. In the exercise of powers not inhibited by the Constitution of the United States or by the Constitution of Texas, our Legislature is, indeed, supreme; but its powers do not really transcend the restrictions imposed by the people themselves in the organic law of the state. Well was it said by the Supreme Court of the United States, in the noted case of United States v. Lee, supra:

"No man in this country is so˙ high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."

And, by way of application, it is pertinent to add here that, as related to provisions of a statute conflicting therewith, our state Constitution is our supreme law, which the courts are ordained to construe and uphold. Cooley, Const. Lim. (7th Ed.) p. 228; Leiber, Civil Liberty and Self-Government.

Consequently, whenever, in a pending cause, such a clash is presented for adjudication by the courts, their duty is plain. Manifestly, they cannot uphold both the invalid statute and the Constitution; they must uphold the latter as paramount, both because it is the solemnly declared will of the whole people, and because each member of the judiciary has sworn to support it, even though the meager maximum of compensation fixed therein for the Chief Executive of this great commonwealth may be glaringly inadequate under present conditions. Always reluctantly, yet independently, that power has been exercised, and that duty has been performed, by the courts of Texas in cases too numerous to mention here. Indeed, upon that doctrine, as announced by the illustrious Chief Justice Marshall, in behalf of the Supreme Court of the United States, in Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60, were laid the very ˙ foundations of our state government; and upon that corner stone rest, ultimately, the rights and liberties of the people—secure, let us hope, from either inadvertent or intentional encroachments of the Legislative or of the Executive Department, or of both combined. ˙

(5) That the Constitution of Texas neither authorizes nor permits the Legislature to appropriate moneys from the state treasury for the purchase, for the Governor, of any of the various above-enumerated articles and things for which said "deficiency warrants" were so issued.

That is the marrow of said decision; and from that conclusion there is, within the entire realm of reason, no possible avenue of escape. In support thereof Judge Fly cites three, and only three, sections of said Constitution, to wit, section 5 of article 4, section 6 of article 16, and section 50 of article 3, supra. But clearly they would be enough if there were none other of similar import and legal effect.

"Compensation," as used in said section 5, evidently was employed in its generic ˙ sense. For a discussion of "compensation," as employed in said Constitution, see my dissenting opinion in Dallas County v. Lively, supra. See, also, State v. Haldeman (Civ. App.) 163 S. W. 1020. The declaration that the "compensation" of the Governor for his services shall be "an annual salary of four thousand dollars" clearly indicates a purpose to restrict such compensation to that amount; the added clause, "and no more," firmly rivets said meaning of the preceding declaration; and the next following provision, "and shall have the use and occupation of the Governor's mansion, fixtures, and furniture," being in the nature of a proviso, or special exception, makes too plain for further argument the express determination rigidly to limit legislative power and authority to vote to the Chief Executive any additional compensation

or largesses whatsoever. Thereby the framers of the Constitution, and, by their votes in adopting it, the great body of the people themselves, unmistakably defined and plainly marked the ultimate boundaries of legislative authority in that direction; and athwart that way, hereafter, will stand said luminous opinion of Chief Justice Fly.

Reinforcing the specific provisions of said section 5 of article 4, which deal specifically with the "compensation" of the Governor, are the above-quoted "limitations" of section 50 of article 3, and also the "general provisions" of section 6 of article 16, upon which, also, Judge Fly relies. Those "limitations" and also those "general provisions" relating to the powers of government certainly aid in developing the spirit and genius of our Constitution in accord with the views herein expressed; and that is true, likewise, of each of the other foregoing quotations from that instrument. Together they form a remarkable setting for, and lift into dazzling prominence, the sharp restrictions upon legislative authority which are mounted in said section 5 of article 4. When so construed, all of said provisions of the Constitution and all other pertinent provisions of that somewhat old-fashioned but humanly sacred document blend into one white light of harmony; whereas, if said provisions of section 5 of article 4, either by themselves or in connection with the foregoing provisions of section 49 of article 3, be construed as authorizing or even as permitting payment, from the state treasury, of the items of expense covered by said permanent injunction, the effect is to introduce serious discord, and becloud our vision, as to the purpose, meaning, and legal effect of our Constitution, as a whole, in relation to such items of expense.

(6) That the items of expense here involved do not come within the "exceptions" of section 49 of article 3.

That holding appeals to my mind as sound. Upon that point, and hereinafter, I will state my views more fully.

(7) That even though, ordinarily, the expression, "etc.," as used in said "deficiency appropriation" act, may be broad enough to include the items of expense here in controversy, those items of expense were not for "Governor's mansion," and, consequently, are not within the terms of said "deficiency appropriation." The effect of that holding, in which I concur, is to establish an added ground for said permanent injunction, without disposing of the other questions in the case. Just here I will add that I do not consider the expression, "etc.," specific within the meaning of section 6 of article 8 of said Constitution, sequor. State v. Wallichs, Auditor, 12 Neb. 407, 11 N. W. 860.

(8) That custom and usage, even when sanctioned by both legislative and executive approval, and however long continued, cannot justify or excuse palpable violations of plain and unambiguous inhibitions and restrictions set out in the Constitution of Texas.

Mere statement of that proposition establishes its correctness on principle, and abundant and eminent authorities support it. Cooley, Const. Lim. (7th Ed.) p. 106. The "claims" or expenses in controversy involve no "rule of property."

To the comptroller's contention that the state should pay said "claims" or expense because "equity" so requires, it may be answered that every claimant must be presumed by the courts to have been warned, in advance, by the Constitution of this state, that all such purchases and employments on the alleged credit of the state were wholly unauthorized, wrongful, and illegal, and that, under its present Constitution, the state will not and cannot pay any such "claim" or expense.

It has long been clearly and firmly settled by numerous well-considered decisions of various appellate courts of this state, including the Supreme Court, that the rules of equity which, under such circumstances, might impel an individual to pay all of said claims, justly or legally cannot control the action of those "invested with the powers of government" to the extent of inducing them to ignore and disobey and defy perfectly plain and mandatory provisions of the Constitution of this state. State v. Wilson, 71 Tex. 291, 9 S. W. 155; State v. Haldeman (Civ. App.) 163 S. W. 1020; Nichols v. State, 11 Tex. Civ. App. 327, 32 S. W. 452; Ketner v. Rogan, 95 Tex. 559, 68 S. W. 774.

I come now to certain features of this case which seem to have been either overlooked or not fully developed. I allude to section 6 of article 8, and sections 49 and 44 of article 3, of our Constitution, considered separately, and in connection with each other, and also in connection with R. S. art. 4342, supra.

Said section 6 of article 8, which seems to have been entirely overlooked in this case, and also in the enactment of article 4342, provides:

"No money shall be drawn from the treasury, but in pursuance of specific appropriations made by law."

As to the meaning of "specific appropriations," see Terrell v. Sparks, Treasurer, 104 Tex. 191, 135 S. W. 519. That term, in the singular number, as used in like article 3, § 22, of the Constitution of Nebraska, aptly was declared by the Supreme Court of that state to mean "a particular, a definite, a limited, and a precise appropriation." State v. Wallichs, Auditor, 12 Neb. 407, 11 N. W. 860. That court also held:

"A specific appropriation is one expressly providing funds for a particular purpose." State v. Wallichs, Auditor, 15 Neb. 609, 20 N. W. 110.

See, also, Stratton v. Green, 45 Cal. 149, as to the meaning of that term in a statute.

"By law" plainly means by a formal "act" of the Legislature. This will be applied to article 4342 further on.

Special attention is hereby directed to the broad and biting provisions of section 49 of article 3, supra, relating to the creation of "debts," "by or on behalf of the state," to

which provision the comptroller points as the permissive basis of legislative powers in this case.

Certainly none of said items of expense possibly can fall within any of the "exceptions" set out in section 49, unless it be the fifth, which permits the "creation" of a "debt" to pay an "existing debt." However, the precise contention of the comptroller is that, when the Legislature actually made said "deficiency appropriation" of $1,500, said "deficiency allowance" of December 14, 1914, already had been made by the Governor, and said items of expense already had been incurred thereunder, and that, consequently, said "claims," based upon said items of expense, were, at date of said "deficiency appropriation," "existing debts" within the meaning of section 49 of article 3, and, for that reason, were within the implied permissive right of the Legislature to appropriate money in payment thereof.

To all that, one good and sufficient answer, couched in general terms, is that when the Legislature came to pay said claims, or items of expense, not one of them constituted a valid "existing debt" against the state. In support of that conclusion, many good reasons may be adduced; and among them I set down the following:

(a) "Existing debt" in section 49 includes, it seems to me, primarily, only such debts as were in existence when said Constitution was adopted, and, secondarily, certainly nothing more than renewals of such "existing debt" and renewals of "debts" to be created in future, but falling within some of the other four exceptions enumerated in section 49; and the claims or items of expense here in controversy were not in any of those classes. I regret that I have not had time for tracing, historically, the meaning of "existing debt" as used in section 49.

(b) Said "claims" were repugnant to section 5 of article 4, as above shown, and to section 44 of article 3, for reasons hereinafter stated, to say nothing of any other section of said Constitution. Surely the Constitution makers did not intend, by one section, to authorize or permit payment of claims which, in practical effect, increase the Governor's compensation beyond the maximum limit fixed by another section, especially when such claims had been incurred without having been provided for by any valid pre-existing law, as required by still another section.

(c) The inhibition in section 49 is leveled primarily against the creation, rather than against payment, of prohibited "debts," "by or on behalf of the state"—a fact which said contention of the comptroller wholly overlooks or utterly disregards.

It follows that the legal effect of section 49 upon said claims or items of expense cannot be ascertained except by test as of the dates of the attempted creation of said claims, rather than as of the date of said "deficiency appropriation" to pay them.

To say that the Legislature had authority to pay said claims because, when they came to make an appropriation therefor, they were valid existing debts' against the state, assumes the very point in issue, and constitutes a mere begging of the question as to whether said claims are permitted, or are inhibited, by section 49.

The "request" for said "deficiency allowance" is set out in the record of this case, and it affirmatively shows, and the fact is not denied, that such "allowance" frankly was "requested" and "approved" for the express purpose of supplementing said original $2,000 general appropriation for "fuel, lights, water, ice, groceries and incidentals," under the head of "Mansion and Grounds." Presumably, said "deficiency allowance" was to defray "claims" or expenses which were to be incurred in future.

The facts, as shown by the record, supra, are that at date of "approval" and "filing" of said "deficiency allowance," on December 14, 1914, none of said claims or items of expense, except two, had been incurred, and that said two claims had been incurred a few days prior to that date. Applying the foregoing, and testing, by section 49, just here, as at the times of their attempted creation, said claims or alleged "debts against the state," it becomes perfectly evident to even the simplest mind that not a single one of the items of expense involved in this appeal was "created," or incurred in payment or in renewal of, or in relation to, or with any thought of, any then "existing debt" whatsoever, whether within or without said fifth exception.

As to said two claims, this may be added: They appear to have been incurred in excess of said original $2,000 appropriation, to supplement which said "deficiency allowance" of $1,500 was approved by the Governor—else, probably, they would have been paid out of said $2,000—and certainly they antedated said "deficiency allowance," and therefore acquired no vitality from it or from article 4342, upon which the comptroller relies: Wherefore, not having been incurred under any sort or pretense of "pre-existing law," they clearly fall within condemnation of section 44 of article 3, supra, and for that reason, if for none other, cannot legally be paid by the state; and this remains true even if article 4342, pursuant to which said other claims were incurred, should be upheld as constitutional and valid.

In determining the full legal effect of section 49 of article 3, as applied to article 4342, this inquiry becomes pertinent: What is meant by "debts," as that word is first used in section 49? Does it embrace "current expenses" of the state government, thereby inhibiting the Legislature from pledging, in any way, the faith and credit of the state in payment thereof? If so, said claims

are thereby barred from payment, and article 4342 is rendered void. Taken literally, "debt" certainly does embrace "current expenses" of the state; and it must be conceded that a cardinal rule of construction is that the words of an instrument ought to be given their plain, natural, ordinary meaning, unless it is reasonably evident that they were there used in some peculiar sense; and that rule applies with special force to a state Constitution, made by the common people.

Upon the other hand, "debts," as used in section 5 of article 11 of that Constitution, relating to cities, and in section 7 of that article, relating to counties and cities, has been held, in a long line of Texas decisions, including several by the Supreme Court, not to include "current expenses" of municipalities. The soundness of those decisions cannot be doubted. There, the requirement being the creation of a "sinking fund" to secure payment of a particular obligation, the context indicates, distinctly, the peculiar sense in which "debt" is there employed; the purpose being to "limit the power of creating debts by making it proportionate to the power of taxation" (City of Terrell v. Dessaint, 71 Tex. 770, 9 S. W. 593), but not carrying any inhibition against incurring liability for "current expenses," within current revenues. And in connection with the fact that the word in question, as there used, is of the significance above indicated, and has been so construed, stands the general rule that, when a particular word recurs in an instrument, it should be given the same interpretation throughout, unless there be some good reason to the contrary.

It is true that in section 49 of article 3 "debts," in the first clause, is not flanked or explained by the context, as is in article 11;' but, nevertheless, its meaning in section 49 should be harmonized, as far as possible, with its meaning as it stands in article 11 and also with the provisions of section 44 of article 3, the latter plainly recognizing the power and authority of the Legislature to provide by law for the compensation of "contractors" and others. Amounts owing upon contracts, payable in money, constitute "debts," within the ordinary signification of that word. Melvin v. State, 121 Cal. 16, 53 Pac. 416. Evidently it was not the purpose of the framers of the Constitution thereby to inhibit the making of all state contracts, such, for instance, as contracts for public buildings; yet such contracts are not embraced by any of the exceptions set out in section 49.

Under such circumstances, I am not prepared to say that "debts," in the inhibitory clause of said section 49, includes "current expenses" of the state government, thereby rendering article 4342 unconstitutional. On the contrary, I am inclined to the opposite view; in which, as applied to that statute, I am strengthened by the reflection that no

court should hold a statute invalid, as violative of a specific provision of the Constitution, unless it is clearly so. I will proceed, therefore, upon the assumption that said section 49 does not prohibit the creation of debts by or on behalf of the state for current expenses of the state, to be paid by specific appropriations from the state treasury. That leaves open, temporarily, for further consideration, the question as to the validity or invalidity of article 4342 when tested by other applicable provisions of the Constitution.

Renewed attention is here called to the fact that section 44 of article 3, supra, expressly declares that the Legislature shall not "grant by appropriation, or otherwise, any amount of money out of the treasury of the state, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law, nor employ any one in the name of the state unless authorized by pre-existing law." That seems very plain and simple. Obviously it says what it means, and means what it says. To that effect are the decisions spanning many years. State v. Wilson, 71 Tex. 291, 9 S. W. 155; Terrell v. Sparks, Treasurer, 104 Tex. 191, 135 S. W. 519; State v. Haldeman (Civ. App.) 163 S. W. 1020, and cases therein cited. In connection with the present case, they supply reading which is at once entertaining and instructive. In the Haldeman Case, the Supreme Court refused a writ of error; this writer being disqualified therein by reason of having been of counsel for the state. Said provisions of section 44 will be applied to article 4342 later on.

Moreover, the requirement in section 44 that the Legislature shall provide by law for the "compensation of all officers * * * not provided for in this Constitution," when read in the light of section 5 of article 4, wherein the compensation of the Governor is precisely "provided for," impliedly inhibits the Legislature from enlarging or reducing the amount of his compensation.

Reverting, next, to article 4342, supra, and studying it in the light of what has been said above, it is observed that said statute expressly provides that upon approval by the Governor of a "deficiency claim," and the filing thereof, "if there is a deficiency appropriation sufficient to meet such claim, then a warrant shall be drawn therefor and the same shall be paid," meaning that, in such event, such claim shall be paid forthwith, and out of the state treasury. Necessarily, that contemplates the making, from time to time, in advance, by the Legislature, of "deficiency appropriations" in certain lump sums, out of which are to be paid any and all such "claims" and items of expense as may be incurred pursuant to article 4342, under any and all "deficiency allowances" which, thereafter, may be approved by the Governor and filed with the comptroller.

Probably the Legislature does not habitu-

ally make such lump-sum deficiency appropriations in advance, for that purpose; but said statute certainly' was framed upon the theory that the Legislature may do so; and it is therefore upon that basis that its constitutionality must be tested out.

However, I well remember that in at least one notable instance the Legislature did exercise its alleged power to do so, making, in that instance, such an advance lump-sum "deficiency appropriation" to the extent of $100,-000. Gen. Laws 31 Leg. 1909, c. 5, p. 392.

Is that portion of article 4342 valid? Clearly it is not. It is plainly repugnant to section 6 of article 8 of our Constitution, which requires that all appropriations from the treasury shall be "specific."

However, that portion of article 4342 is severable from the remainder thereof, and even without such invalid portion the Legislature probably would have enacted the remaining portion of that article.

But is the remaining portion valid? Let us see.

It will be observed that said statute places no limitation whatever, in amount, upon the power which it attempts to confer upon the Governor to "approve" "deficiency claims" commonly known as "deficiency allowances." The evident purpose of the statute, and its inevitable legal effect, if said remaining portion thereof be valid, is to confer upon the Governor, at least when acting in conjunction with certain individuals therein designated, full, absolute, and untrammeled power and authority to create, upon the faith and credit of the state, "debts" and "claims" against the state, for purposes more varied, in some respects, than those mentioned in an ordinary general appropriation act, and in absolutely unlimited amounts. I regard it as too plain for argument that "claims" or "expenses" incurred under such a "deficiency allowance," as was done in this case, must be held to occupy the status of valid debts against the state, if said remaining portion of article 4342 is, indeed, constitutional and valid.

It is part of the public history of this state that such "deficiency claims" or allowances biennially cover a very wide range, and include, in particular instances, and especially in the aggregate, large sums of money. For illustration, I am informed that there is now pending before the present Legislature a bill to appropriate from the state treasury' largely more than a quarter of a million dollars for the payment of such "deficiency claims" or "allowances," which have been "approved" by the Governor, under article 4342, within about two years.

It is, of course, by what a statute undertakes to authorize and require, rather than by what actually' is done thereunder, that its constitutionality is to be tested; but its actual operation in practice sometimes serves simply to call attention to, and emphasize, its possibilities, thereby quickening comprehension as to its real legal effect, and so aiding in the determination of questions involving its validity.

The possibilities, under article 4342, if even only said remaining portion thereof is valid, are indeed startling, because thereunder, and in strict compliance with its every letter, the Governor, and another belonging to any of the several classes of state officials therein designated, can incur, and pledge the faith and credit of this state for the payment of, expenses, claims, and "debts" for the widest range of things, and in unlimited amounts, and that, too, under circumstances which practically compel the Legislature to make, subsequently, in the most perfunctory manner, corresponding "deficiency appropriations" in payment of all such items of indebtedness; failure of the Legislature to do so constituting, in that event, nothing less than rank state repudiation.

Is all that, which undoubtedly is within the scope and meaning of R. S. art. 4342, consonant with the Constitution of Texas and in accord with the spirit or even the letter of its various provisions? I think not. If it is, then my study of that instrument has been in vain.

I decline to charge, or to admit or to believe that our fathers, who drafted and adopted it, were so wanting in the fundamental elements of state-craft, or that they left the state treasury so unguarded, or that they contemplated or left possible such delegation by the Legislature of the power conferred upon it exclusively, to pledge, appropriate, and expend so large a portion or any of the fruits of taxation for the support of the state government in all its marvelous ramifications.

Surely, those who made our Constitution did not contemplate that the lawmaking department of the government of this great commonwealth would ever, to such great extent, or even at all, undertake to pass on to others, though they be trusted and trustworthy state executive or administrative officers of high degree, such unmeasured and unbridled power and authority over public funds, thereby and to that extent abdicating a very important portion of its own high legislative functions, and reducing the Legislature itself, in that respect, to the rank of an amanuensis registering the will of its masters who, in advance, already have determined both the purposes and amounts of such expenditures from the state treasury. I do not so construe our state Constitution. I have no doubt that the spirit, and even the literal meaning, of the declaration that "no money shall be drawn from the treasury but in pursuance of specific appropriations made by law," found in section 6 of article 8 of that instrument, especially when considered along with cognate provisions of the Constitution, is that the Legislature itself, rather than the Governor and another, shall, in the

first instance, and when the matter is open and unprejudiced, and in the exercise of real and potential legislative discretion, pass its own determining judgment upon the purposes, if any, for which the money for all the people is to be appropriated, and also upon the amounts of such appropriations.

To say that the Constitution of Texas confides to the Legislature (including the Governor to the extent of his approving and vetoing powers) exclusive authority to incur debts against the state and to pledge its credit in payment thereof, and to appropriate money from the state treasury in payment thereof, would be but commonplace.

Let the organic law speak for itself, disclosing its great purposes:

"The powers of the government of the state of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." Section 1 of article 2.

That identical language formed the corresponding section of the Constitution of 1845, and since then the substance thereof has been preserved continuously in our various Constitutions.

The corresponding provision of the Constitution of the Republic of Texas (1836) was:

"The powers of this government shall be divided into three departments, viz. legislative, executive, and judicial, which shall remain forever separate and distinct." Section 1, art. 3.

It will be observed that our present Constitution expressly prohibits the exercise by any "person or collection of persons belonging to one department" of "any power properly attached to either of the others, except in instances herein expressly permitted." The exceptions do not include the creation of debts against the state.

"The legislative power of this state shall be vested in a Senate and House of Representatives, which together shall be styled, 'The Legislature of the State of Texas.'" Section 1, art. 3.

"The Legislature shall pass such laws as may be necessary to carry into effect the provisions of this Constitution." Section 42, art. 3.

"The Legislature shall provide by law for the compensation of all officers, servants, agents and public contractors, not provided for in this Constitution." Section 44, art. 3.

"The Legislature shall have no power to give or lend or to authorize the giving or lending, of the credit of the state in aid of, or to, any person," etc. Section 50, art. 3, supra.

This is a clear recognition of the general power and authority of the Legislature to give or lend the credit of the state, except as restricted by the Constitution.

"The Legislature shall have no power to make any grant, or authorize the making of any grant, of public money to. * * *" Section 51, art. 3.

This is a clear recognition of the general power and authority of the Legislature to appropriate money from the state treasury, except as restricted by the Constitution.

See, also, section 52 of article 3, as to power to make laws conferring upon counties and cities and towns, respectively, similar authority over their respective revenues.

"The Legislature shall have no power to grant, or to authorize any county or municipal authority to grant, any extra compensation, fee or allowance to a public officer, agent, servant or contractor after service has been rendered or a contract has been entered into and performed in whole or in part; nor pay, nor authorize the payment of, any claim created against any county or municipality of the state, under any agreement or contract, made without authority of law." Section 53 of article 3.

"No money shall be drawn from the treasury but in pursuance of specific appropriations made by law." Section 6, art. 8.

"The Legislature shall have no power to appropriate any of the public money for the establishment and maintenance of a bureau of immigration, or for any purpose of bringing immigrants to this state." Section 56, art. 16.

"The Legislature may, from time to time, make appropriations for preserving and perpetuating memorials of the history of Texas, by means of monuments, statues, paintings, and documents of historical value." Section 39, art. 16.

"No law passed by the Legislature, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of an emergency." Section 39, art. 3.

The right and duty of the Governor to participate in the making of all laws, by signing or vetoing, is clear (section 14, art. 16); but that very fact defines and emphasizes the limitations placed by the Constitution upon his rights and duties in regard to pledging the credit of the state and in regard to appropriations from the state treasury in payment of debts so made.

Irresistibly the foregoing provisions of our fundamental law compel the conclusion that, subject only to limitations and restrictions set out in that instrument, in the lawmaking department of the state government rests the primary and, as well, the exclusive power of determining for what purposes and in what amounts the credit of the state shall be pledged, and that the lawmaking department itself, and not a delegated dual agency, carries at its girdle the magic key which, in practical operation and effect, and not merely in name only, unlocks the portals of the state treasury.

It follows that the operation of article 4342 necessarily is to disturb the delicate system of governmental "checks and balances" established by the Constitution, and to disregard the solemn restrictive provisions of section 1 of article 2, of our present Constitution.

That legislative power cannot be delegated is a general rule and maxim to which all judicial minds give ready assent, certain seeming exceptions being almost as well recognized.

In applying that abstract rule to concrete cases which come before them, courts sometimes differ as to its applicability; but there is, I think, no room for two opinions upon

the proposition that R. S. art. 4342, involves a clearly undue delegation of legislative power and authority.

From what has been said above, if same be sound and correct (and thus far, at least, I have been unable to see or find any avenue of escape therefrom), R. S. art. 4342, is wholly unconstitutional and void, and therefore is not a "pre-existing law" in contemplation of section 44 of article 3, supra.

The immediate result is that the "claims" or items of expense involved in this appeal, not having been authorized by any valid "pre-existing law," are themselves invalid as claims or debts against the state, and could not, legally, be paid by the state, even though they were not repugnant to any other provision of the Constitution of Texas.

Certainly it cannot be true, and it has not been contended in this case, that, in the absence of any valid and "pre-existing law" authorizing it, even the Governor has power or authority to incur any expense on behalf of the state, or to pledge the credit of the state in any wise to any one for anything, great or small. State v. Wilson, 71 Tex. 302, 9 S. W. 155.

However, even if R. S. art. 4342, is, in all respects, constitutional and valid, there is still another unanswerable reason why even such of said claims or items of expense as were created or incurred after the approval and filing of said "deficiency allowance" cannot legally be paid by the state. It is this: Said original $2,000 appropriation, whether considered as an entity or item by item, was repugnant to and inhibited by said section 5 of article 4 of our state Constitution, in consequence of which fact said original appropriation was void in all its parts; and therefore constituted no legitimate, valid, or sufficient predicate or basis for said subsequent purely supplementary "deficiency allowance"; wherefore, said "deficiency allowance" itself was unauthorized by article 4342, and was utterly illegal and invalid, and constituted no legal authority whatever for the creation or payment of said claims.

Article 4342 evidently contemplates that any deficiency allowance thereunder must be to supplement some antecedent and valid original appropriation. Said original $2,000 appropriation being void, there was nothing to supplement; hence article 4342 was not applicable.

That said $2,000 general appropriation was void because each separate item or element thereof was repugnant to and inhibited by said section 5 of article 4 of the Constitution is unquestionably certain. Said original $2,000 appropriation embraced the items "fuel, lights, water, ice, groceries and incidentals," but none other. Testing them out, separately, by the terms of section 5 of article 4, which provides that the Governor shall receive "as compensation for his services an annual salary of four thousand dollars, and no more, and shall have the use and occupation of the Governor's mansion,"

fixtures and furniture," it is obvious that no one such item is either "salary," or "mansion," or "fixtures," or "furniture"; consequently, each such item is void.

The whole purpose and legal effect of that section of the Constitution may be summed up in the statement that it provides and requires, in substance, that in full compensation for his official services the Governor shall have an annual salary of $4,000, and the free use and occupation of the mansion and grounds, including fixtures and furniture, but nothing else whatever.

The never-ceasing wonder to me is that any one ever fancied that they mean anything else, less or more, or that R. S. art. 4342, is a valid statute, or that the claims in controversy constitute valid debts against the state of Texas, or that, legally, they may be paid out of the state treasury.

For all the reasons above stated, the writ of error should have been denied by the Supreme Court; and, as stated, it was denied.