# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

================================

## ON MOTION FOR REHEARING

================================

### NO. 03-06-00501-CV

**Edd Hendee, Individually and as Executive Director of C.L.O.U.T., Appellant**

**v.**

**David Dewhurst, Tom Craddick, State of Texas, and the
Texas Legislative Budget Board, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-06-002156, HONORABLE WILLIAM E. BENDER, JUDGE PRESIDING**

## O P I N I O N

We withdraw our opinion and judgment issued April 17, 2007, and substitute the following in its place. The Court has overruled the State Defendants' motions for rehearing and en banc reconsideration.

In response to the Texas Supreme Court's decision in the *Neeley v. West Orange Cove* case,[1] the 79th Legislature, during its third called session of April and May 2006, enacted H.B. 1,

---

[1] *Neeley v. West Orange Cove-Consolidated Indep. Sch. Dist.*, 176 S.W.3d 746 (Tex. 2005). The supreme court held that Texas's public school finance system constituted an unconstitutional state property tax and gave the legislature until June 1, 2006 to enact corrective legislation. *Id*. at 800.

which the Governor signed into law on May 31 of that year. Among other things, H.B. 1 attempted to shift some of the burden of funding Texas's public schools from local property taxpayers to the state and, to that end, made additional appropriations of $3.825 billion for the biennium ending on August 31, 2007. In June 2006, Edd Hendee, individually and as executive director of the group Citizens Lowering Our Unfair Taxes (C.L.O.U.T.) (collectively, Plaintiffs), filed suit against the Lieutenant Governor, the Speaker of the House of Representatives, the Comptroller, and the members of the Legislative Budget Board (LBB),[2] all in their official capacities, and the State of Texas, seeking declarations that H.B. 1 was unconstitutional and unlawful. Plaintiffs' central allegation is that the appropriation called for in H.B. 1 caused the Defendants to exceed the aggregate biennial cap on the rate of growth of appropriations under article VIII, section 22 of the Texas Constitution and chapter 316 of the government code. These provisions mandate that the "rate of growth of appropriations from state tax revenues" not dedicated by the constitution not exceed the "estimated rate of growth of the state's economy." Tex. Const. art. VIII, § 22(a); Tex. Gov't Code Ann. § 316.001 (West 2005). All defendants except the Comptroller (collectively, the "State Defendants") filed a plea to the jurisdiction. The district court granted the plea without specifying its grounds, and dismissed Plaintiffs' claims against the State Defendants for want of jurisdiction.

---

[2] The LBB is a permanent joint committee of the Texas Legislature comprised of the lieutenant governor, speaker of the house of representatives, the chairman of the senate finance committee, the chairman of the house appropriations committee, the chairman of the house ways and means committee, three members of the senate appointed by the lieutenant governor, and two additional house members appointed by the speaker. Tex. Gov't Code. Ann. § 322.001(a) (West 2005). The lieutenant governor and speaker of the house are joint chairs of the LBB. *Id.* § 322.001(b). The LBB develops budget and policy recommendations for legislative appropriations, including a draft General Appropriations Act each session, *id.* § 322.008(c) (West 2005), and fiscal impact statements regarding other proposed legislation. *Id.* § 314.001 (West 2005).

Plaintiffs bring this interlocutory appeal from the district court's order. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2006); *Perry v. Del Rio*, 53 S.W.3d 818, 820-23 (Tex. App.—Austin 2001), *pet. dism'd*, 66 S.W.3d 239, 242 (Tex. 2001). We affirm the district court's order of dismissal in part, reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

**Constitutional and statutory provisions**

Before turning to the jurisdictional issues presented by this appeal, it is helpful to consider the constitutional and statutory context in which they arise.

Article VIII, section 22(a) of the Texas Constitution provides:

> In no biennium shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy. The legislature shall provide by general law procedures to implement this subsection.

Tex. Const. art. VIII, § 22(a). An "appropriation" refers to a legislative enactment authorizing state funds to be expended for particular purposes. The constitution elsewhere requires that "[n]o money shall be drawn from the Treasury but in pursuance of specific appropriation made by law; nor shall any appropriation of money be made for a longer term than two years." *See* Tex. Const. art. VIII, § 6.[3] "State tax revenues not dedicated by this constitution" refers to one source of funds that the

---

[3] The parties appear to agree that the relevant "biennium" is the state's fiscal biennium, which runs from September 1 of each odd-numbered year through August 31 of the succeeding odd-numbered year.

3

legislature could appropriate; others include non-tax revenues and tax revenues whose use is dedicated by the constitution.

Subsection (b) of article VIII, section 22 authorizes the legislature to override the appropriations limit otherwise imposed by subsection (a) by adopting a resolution, approved by a record vote of each house, finding that an emergency exists and identifying the nature of that emergency, in which case the legislature's excess appropriation may not exceed the amount specified in the resolution. *Id.* art. VIII, § 22(b). Further, these limits expressly do not alter, amend or repeal the Texas Constitution's "pay-as-you-go" or balanced budget limitation of article III, section 49a. *Id.* art. VIII, § 22(c). The "pay-as-you-go" limitation generally requires that before any bill containing an appropriation can be considered passed and be sent to the governor, the comptroller must certify that each amount appropriated is within the amount of revenue estimated to be available in the corresponding affected funds. *Id.* art. III, § 49a(b).[4]

---

[4] Article III, section 49a provides in full:

    (a)    It shall be the duty of the Comptroller of Public Accounts in advance of each Regular Session of the Legislature to prepare and submit to the Governor and to the Legislature upon its convening a statement under oath showing fully the financial condition of the State Treasury at the close of the last fiscal period and an estimate of the probable receipts and disbursements for the then current fiscal year. There shall also be contained in said statement an itemized estimate of the anticipated revenue based on the laws then in effect that will be received by and for the State from all sources showing the fund accounts to be credited during the succeeding biennium and said statement shall contain such other information as may be required by law. Supplemental statements shall be submitted at any Special Session of the Legislature and at such other times as may be necessary to show probable changes.

    (b)    Except in the case of emergency and imperative public necessity and with a four-fifths vote of the total membership of each House, no appropriation in

Article VIII, section 22 was born of a tax reform effort in the late 1970s.[5]  It was one of several components of a "Tax Relief Amendment" to the constitution proposed earlier that year by the 65th legislature during a special session called for that purpose by Governor Dolph Briscoe.  H.J.R. 1, 65th Leg., 2d C.S.  It was apparently modeled on a Tennessee provision.  *See* Janice C. May, *The Texas State Constitution: A Reference Guide* 310 (1996).  Article VIII, section 22 was ratified by the voters in November 1978.

As the second sentence of Article VIII, section 22(a) requires, the legislature enacted laws to implement the provision.  The legislature did so during the regular session beginning in January 1979, immediately following article VIII, section 22's ratification.  *See generally* Acts 1979, 66th Leg., R.S., ch. 302.  With some intervening amendments, these enactments are now codified in chapter 316 of the government code.  *See id.* art. 9, § 1.

---

excess of the cash and anticipated revenue of the funds from which such appropriation is to be made shall be valid.  No bill containing an appropriation shall be considered as passed or be sent to the Governor for consideration until and unless the Comptroller of Public Accounts endorses his certificate thereon showing that the amount appropriated is within the amount estimated to be available in the affected funds. When the Comptroller finds an appropriation bill exceeds the estimated revenue he shall endorse such finding thereon and return to the House in which same originated. Such information shall be immediately made known to both the House of Representatives and the Senate and the necessary steps shall be taken to bring such appropriation to within the revenue, either by providing additional revenue or reducing the appropriation.

Tex. Const. art. III, § 49a.

[5]  *See* John Greene & Larry Toomey, *The Tax Reform Act of 1979*, 42 Tex. B.J. 1007, 1007 (1979) (contemporaneously observing, with reference to the notable California taxpayer-relief measures of the 1970s, that "Proposition 13 sentiment has invaded the Texas Legislature.").

Section 316.001, government code, tracks the mandate of article VIII, section 22(a): "The rate of growth of appropriations in a biennium from state tax revenue not dedicated by the constitution may not exceed the estimated rate of growth of the state's economy." Tex. Gov't Code Ann. § 316.001. Other provisions of chapter 316 address how "the estimated rate of growth of the state's economy" is calculated and provide mechanisms for ensuring that, as article VIII, section 22(a) requires, the rate of growth in appropriations does not exceed the estimated rate of growth of the state's economy. The LBB is charged with several key responsibilities within this statutory scheme.

Under section 316.002(b), the LBB is to determine both "the estimated rate of growth of the state's economy" and the rate of appropriations growth by comparing those figures from the baseline of the current biennium to the next biennium. *Id.* § 316.002(b) (West 2005). It calculates "the estimated rate of growth of the state's economy" from the current biennium to the next biennium by "dividing the estimated Texas total personal income for the next biennium by the estimated Texas total personal income for the current biennium." *Id.* § 316.002(a)(1), (b). "Using standard statistical methods, the board shall make the estimate by projecting through the biennium the estimated Texas total personal income reported by the United States Department of Commerce or its successor in function." *Id.* § 316.002(b). However, section 316.002(c) contemplates that "[i]f a more comprehensive definition of the rate of growth of the state's economy is developed and is approved" by a committee of the governor, lieutenant governor, speaker of the house of representatives, and comptroller, "the board may use that definition." *Id.* §§ 316.002(c), 316.005

(West 2005). The State Defendants represent that such an alternative, "more comprehensive" definition has never been adopted.

Section 316.002 also requires the LBB to establish "the level of appropriations for the current biennium from state tax revenues not dedicated by the constitution." *Id.* § 316.002(a)(2). This figure is itself partly an estimate, for reasons relating to the nature of appropriations.[6] Even without additional legislative action, the amount of an appropriation, as well as its funding source, may change during a biennium, such as when changes in economic conditions not originally forecasted impact the amount or composition of funding sources subject to an appropriation. Because the "level of appropriations for the current biennium from state tax revenues not dedicated by the constitution" is calculated *during* the current biennium, it is comprised of both actual appropriations of non-dedicated tax revenues (appropriated non-dedicated tax revenues that have already been spent, and whose amount is thus finally ascertainable) and estimated appropriations of non-dedicated tax revenues (the amount of such funds that the LBB anticipates will be spent pursuant to appropriations during the remainder of the biennium). Reflecting the potential for unforeseen changes in the amount or funding source of appropriations later in the biennium, the LBB determines "the level of appropriations for the current biennium from state tax revenues not dedicated by the constitution" "subject to adjustments resulting from revenue forecast revisions or subsequent appropriations certified by the Comptroller."[7]

---

[6] We base the following observations regarding the nature of appropriations chiefly on public documents Plaintiffs attached to their petition.

[7] Notice of Meeting of the Legislative Budget Board, Agenda Item 3 (Nov. 17, 2004) (C.R. 57, Ex. E to Plaintiff's original petition).

7

The LBB applies the "rate of growth of the state's economy" to the "the level of appropriations for the current biennium from state tax revenues not dedicated by the constitution" to yield the appropriations limit, or "spending cap": "the amount of state tax revenues not dedicated by the constitution that could be appropriated for the next biennium within the limit established by the estimated rate of growth of the state's economy." *Id.* § 316.002(a)(3). Reflecting the potential that the current-biennium appropriation baseline might change, the LBB's spending cap calculation is expressly made "subject to adjustments in [current] biennial appropriations."[8]

The LBB is to "hold a public hearing" by December 1 of each even-numbered year (*i.e.*, those preceding a regular legislative session) "to solicit testimony regarding the proposed items of information and the methodology used in making the calculations required by Section 316.002." *Id.* § 316.004 (West 2005). Before it approves the items of information required by section 316.002, the LBB is required to publish in the Texas Register the proposed items of information and "a description of the methodology and sources used in the calculations." *Id.* § 316.003 (West 2005).

After the LBB approves the items of information required by section 316.002, it must submit the information to the committee composed of the governor, lieutenant governor, speaker of the house of representatives, and comptroller. *Id.* § 316.005(a). This committee has ten days to adopt the items, with any amendments it might make. *Id.* § 316.005(b). If the committee fails to act within the ten-day period, the items are deemed approved by the committee. *Id.* § 316.005(c). The State Defendants represent that this committee "has never met to approve these items," so that "the items have historically been approved by the inaction of the committee."

---

[8] *Id.*

"To ensure compliance with Article VIII, Section 22, of the Texas Constitution," the LBB is prohibited from transmitting "in any form" to the governor or legislature either the "budget of estimated appropriations" or the general appropriations bill until "the limit on the rate of growth of appropriations has been adopted as required by this subchapter." *Id.* § 316.002(d). These events are ordinarily required to occur not later than the fifth and seventh days, respectively, after a regular session convenes. *Id.* § 322.008(c) & (d) (West 2005). "In the absence of an action by the [LBB] to adopt a spending limit," the estimated rate of growth of the state's economy is deemed to be zero, meaning that appropriations for the next biennium from non-dedicated tax revenues could not exceed the amount of such appropriations in the current biennium. *Id.* § 316.002(e).[9]

Additionally, section 316.006 provides that unless authorized by a majority vote of the LBB members from each house, the LBB's budget recommendations relating to the proposed appropriations of state tax revenue not dedicated by the constitution may not exceed the limit on estimated appropriations. *Id.* § 316.006 (West 2005). Moreover, section 316.008 provides that the "proposed limit" on appropriations is "binding on the legislature with respect to all appropriations for the next biennium made from state tax revenues not dedicated by the constitution" absent a resolution to raise the cap under article VIII, section 22(b). *Id.* § 316.008(a) (West 2005). "The rules of the house of representatives and senate shall provide for enforcement" of this limitation.

---

[9] Subsections (d) and (e), added in 1991, apparently responded to an initial failure or refusal of the LBB to comply with its statutory requirements to set a spending cap. C.R. 54; *see* Janice C. May, *The Texas State Constitution: A Reference Guide* 310 (1996) (noting that twenty legislators had sought mandamus with the Texas Supreme Court to compel the LBB to act).

*Id.* § 316.008(b). Both the house and senate rules in effect during the 79th Legislature's third called session, when H.B. 1 was enacted, contained virtually identical provisions that:

> Unless within the authority of a resolution or resolutions adopted pursuant to Article VIII, Section 22(b), of the Texas Constitution, it is not in order for the [chamber] to consider for final passage on third reading, on motion to concur in [the other chamber's] amendments, or on motion to adopt a conference committee report, a bill appropriating funds from the state treasury in an amount that, when added to amounts previously appropriated by bills previously passed and sent or due to be sent to the comptroller, would exceed the limit on appropriations established under Chapter 316, Government Code.

Tex. H.R. Rule 8, § 21(f), Tex. H.R. 5, 79th Leg., R.S., 2005 H.J. of Tex. 108, 114; Tex. S. Rule 7.20, Tex. S. Res. 3, 80th Leg., R.S., 2007 S.J. of Tex. 24. In other words, a bill that members believe would exceed the spending cap is subject to a point of order. If determined meritorious and sustained by the chamber's presiding officer, such a ruling would prevent passage of the bill until the defect is remedied. *See* Tex. H.R. Rule 1, § 9, Tex. H.R. 3, 80th Leg., R.S.; Tex. S. Rule 4.03, Tex. S. Res. 3, 80th Leg., R.S.

**Plaintiffs' allegations**

Plaintiffs' live pleading before the district court was their original petition, filed in June 2006. In it, Plaintiffs sought relief under the Uniform Declaratory Judgments Act[10] based on claims that the Defendants violated article VIII, section 22(a) of the Texas Constitution and section 316.001 of the government code. Plaintiffs seek "declaratory relief to stop and prevent unconstitutional and illegal spending by the Texas State government." They allege two chief

---

[10] Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997 & Supp. 2006) ("UDJA").

theories regarding how H.B. 1's appropriation violates article VIII, section 22 or chapter 316, as well as a theory that chapter 316 violates the separation of powers.

Plaintiffs allege that the legislature's requirement that the "estimated rate of growth of the state's economy" be presumptively based solely on growth in Texas's total personal income, *see* Tex. Gov't Code Ann. § 316.002(b) & (c), and the LBB's sole reliance on that measure, are inconsistent with the text and intent of article VIII, section 22(a). As a matter of constitutional interpretation, Plaintiffs urge, the "estimated rate of growth of the *state's economy*" means growth of the entire state economy, not merely the growth of a single component—personal income. Plaintiffs also rely on the legislative history of article VIII, section 22. They observe that the legislature apparently considered but eventually rejected a version of subsection (a) that would have explicitly tied the spending limit to growth in personal income,[11] and urge us to infer intent to reject

---

[11] As introduced in the house of representatives, the proposed Tax Relief Amendment, in relevant part, would have limited the growth of all legislative appropriations from state tax revenue to a fixed annual increase of 7½ percent. H.J. of Tex., 65th Leg., 2d C.S. 9 (1978). That provision was deleted entirely in the committee substitute, *see id.* at 92, but the following provision was later added through a house floor amendment:

> That Article VIII of the Texas Constitution be amended by adding Section 21 to read as follows:
>
> Sec. 21 (a) Except as otherwise provided by this Section, legislative appropriations from State tax revenue for a fiscal biennium may not exceed the total of those appropriations for the preceding biennium by more than would result from a percentage equaling the percentage of growth of total personal income of the State during the previous biennium, as reported by the Comptroller of Public Accounts.
>
> (b) The limitation in subsection (a) hereof shall not apply to appropriations and tax increases necessary to provide for reimbursement to school districts to replace revenues lost by partial or total abolition of ad valorem property taxes.

personal income growth as the sole basis for the spending cap. Plaintiffs allege that "this barometer [personal income growth] has been historically proven to wildly overstate the growth of the state's economy," causing spending caps set on that basis to permit appropriations exceeding the true constitutional limit. Plaintiffs complain that, in this way, H.B. 1's appropriation is unconstitutional relative to the "real" rate of economic growth as compared to both the baseline of the 2004-2005 biennium and 1978, when article VIII, section 22 was ratified. Regarding the latter, Plaintiffs complain that overestimations of economic growth have "compounded over the decades" without correction, causing the spending cap to likewise deviate from constitutional requirements.[12]

Second, Plaintiffs allege that the mechanisms the legislature has adopted to implement and enforce article VIII, section 22—chiefly found in chapter 316 of the government

---

(c) If the legislature by adoption of a resolution approved by a record vote of three-fifths of the members of each house, finds that an emergency exists and identifies the nature of the emergency, the legislature may provide for appropriations in excess of the amount authorized by Subsection (a) of this section. The excess authorized under this subsection may not exceed the amount specified in the resolution.

(d) In no case shall appropriations exceed revenues as provided in Article III, Section 49a.

*Id*. at 142-43. This version of the provision that became article VIII, section 22 remained in the Taxpayer Relief Amendment passed by the house, *id*., but was deleted in the senate committee substitute and omitted from the version approved by that chamber. *Id*. at 309. The conference committee agreed on the language that now appears in article VIII, section 22, which was submitted to and ratified by the voters.

[12] To the extent Plaintiffs are complaining about specific appropriations and expenditures made during prior biennia, as opposed to forthcoming expenditures under the H.B. 1 appropriation, they would lack standing under the principles we discuss below. *See Hoffman v. Davis*, 100 S.W.2d 94, 95 (Tex. 1937).

code—constitute unconstitutional delegations of its legislative power to the LBB in violation of separation-of-powers limitations. Tex. Const. art. II, § 1.[13] Plaintiffs also complain that when enacting H.B. 1, the legislature relied on an upward revision of the LBB's original spending cap made by LBB staff—not the board itself—which, they contend, was invalid and void. Specifically, Plaintiffs allege—and the State Defendants acknowledge—that in November 2004, the LBB approved a resolution complying with chapter 316 that set a spending limit of $52.145 billion that could be appropriated from non-dedicated state tax revenues during the 2006-07 biennium.[14] Plaintiffs also allege—and the State Defendants agree—that the spending cap was adjusted upward in late 2005 to $55.6 billion. In contending that this adjustment was void, Plaintiffs emphasize statements in a December 2005 LBB publication that "[t]he [LBB] instructed *staff* to adjust the level of 2004-2005 appropriations from state tax revenues not dedicated by the Constitution and 2006-2007 spending limit calculations to reflect subsequent 2005 appropriations certified by the Comptroller." (Emphasis added).[15] Plaintiffs urge that such an adjustment would have been valid only if enacted by the legislature through general law procedures, or at least by the LBB itself through a formal resolution under chapter 316. Because this upward adjustment of the

---

[13] In their original petition, Plaintiffs also alleged unconstitutional delegation of legislative powers to the committee established under section 316.005, but do not appear to press this claim on appeal.

[14] Notice of Meeting of the Legislative Budget Board, Agenda Item 3 (Nov. 17, 2004) (C.R. 57, Ex. E to Plaintiff's original petition).

[15] Legislative Budget Board's "Fiscal Size Up 2006-2007 Edition" (published Dec. 2005) (C.R. 58, 61, Ex. F to Plaintiffs' original petition).

spending cap was invalid, Plaintiffs assert, the cap remained at $52.145 billion, a level that undisputedly was exceeded by subsequent appropriations for that biennium.

In the alternative, Plaintiffs allege that H.B. 1's appropriation "cause[s] total appropriations to exceed even the unapproved staff-generated limit by $1.3 billion dollars." Plaintiffs allege—and the State Defendants acknowledge—that "based on the appropriation[s] made prior to the 2006 special session, the Legislature had appropriated $53.0 billion in Non-Dedicated General Revenue Related Funds." Plaintiffs concede that this left $2.6 billion in appropriations from non-dedicated state tax revenues that could have been made without exceeding "the $55.6 billion staff generated unapproved limit."[16] Because H.B. 1's appropriation was $3.9 billion, Plaintiffs allege, it "caused total appropriations to exceed even the unapproved staff-generated limit by $1.3 billion dollars."

Plaintiffs request declarations including that "the appropriation in H.B. 1 . . . is unconstitutional on the basis that i[t] exceeds the mandates of Article VIII, Section 22(a) as applied since its enactment, or alternatively that said appropriation is unconstitutional on the basis that it exceeds the mandates of Article VIII, Section 22(a) as applied over the last biennium, or alternatively that said appropriation is unconstitutional because it exceeds even the extremely generous and faulty estimates provided by the Legislative Budget Board and is, according to the LBB's own calculations, in violation of Article VIII, Section 22(a)."

---

[16] *Id.*

**Proceedings below**

The State Defendants filed a plea to the jurisdiction[17] challenging only the sufficiency of Plaintiffs' pleadings; they did not challenge the jurisdictional facts Plaintiffs pleaded or submit evidence in support of their plea. The State Defendants argued that Plaintiffs failed sufficiently to plead standing or an *ultra vires* act (so as to avoid sovereign immunity[18]) and that the claims present non-justiciable political questions. Following a brief hearing at which neither side presented evidence, the district court ruled from the bench that it would grant the State Defendants' jurisdictional plea and dismiss Plaintiffs' suit. This appeal followed.

## DISCUSSION

On appeal, Plaintiffs bring a single issue complaining that the district court erred or abused its discretion in granting the State Defendants' plea to the jurisdiction.

**Standard of review**

A challenge to a trial court's subject matter jurisdiction may be asserted in a plea to the jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Whether a court has subject matter

---

[17] Although named as a defendant, the Comptroller—then Carole Keeton Strayhorn—filed an answer denying responsibility for the complained-of appropriations, as well as a "Statement of Realignment" with Plaintiffs to the extent of "contending that meaningful control of, and effective limitations on, state spending was intended by the voters in adopting Article VIII, § 22(a), and that the same should be enforced by appropriate judgments of this Court, to the extent authorized by law." The Comptroller is not a party to this appeal.

[18] *See McLane Co. v. Strayhorn*, 148 S.W.3d 644, 649 (Tex. App.—Austin 2004, pet. denied).

15

jurisdiction is a question of law. *Miranda*, 133 S.W.3d at 226. The determination of whether a trial court has subject matter jurisdiction begins with the pleadings. *Id.* The pleader has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Whether the pleader has met this burden is a question of law that we review de novo. *Id.* We construe the pleadings liberally and look to the pleader's intent. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend. *Id.* at 226-27; *Elgin Indep. Sch. Dist. v. R.N.*, 191 S.W.3d 263, 272 (Tex. App.—Austin 2006, no pet.). If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Miranda*, 133 S.W.3d at 227.

However, "a court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland*, 34 S.W.3d at 555. "When a plea to the jurisdiction challenges the existence of facts alleged by the pleader to establish the trial court's subject matter jurisdiction, the trial court must consider relevant evidence submitted by the parties." *Miranda*, 133 S.W.3d at 227 (citing *Bland*, 34 S.W.3d at 555). To varying degrees, this jurisdictional inquiry may also implicate the merits of the pleader's cause of action. *Compare Bland*, 34 S.W.3d at 554-55 (citing challenges to associational standing and personal jurisdiction as entailing "an evidentiary inquiry [that] . . . does not involve a significant inquiry into the substance of the claims" and holding

that challenge to taxpayer standing did not implicate merits), *with Miranda*, 133 S.W.3d at 227-28 (describing overlapping jurisdictional and merits inquiry regarding challenge to whether parks and wildlife department acted with gross negligence so as to waive sovereign immunity under the recreational use statute). When the consideration of a trial court's subject matter jurisdiction requires the examination of evidence, the trial court exercises its discretion in determining whether the jurisdictional determination should be made at a preliminary hearing or await fuller development of the case, mindful that the jurisdictional determination must be made as soon as practicable. *Miranda*, 133 S.W.3d at 227-28.

"[I]n a case in which the jurisdictional challenge implicates the merits of the plaintiff's cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists." *Id*. at 227. This standard, which "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)," seeks to reconcile "the fundamental precept that a court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided" while "protect[ing] the interests of the state and the . . . claimants in cases . . . in which the determination of the subject matter of the court implicates the merits of the parties' cause of action." *Id*. at 227-28. Accordingly, when reviewing a plea to the jurisdiction in which the pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the nonmovant and indulge every inference and resolve any doubt in the nonmovant's favor. *Id*. at 228. Whether the evidence presents a fact question regarding a jurisdictional fact is a question of law that we review de novo. *Id*.

17

Because the district court did not specify its grounds for dismissal, we may affirm on any meritorious ground on which the court could have relied. *See Atmos Energy Corp. v. Abbott*, 127 S.W.3d 852, 855 (Tex. App.—Austin 2004, no pet.); *cf. Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2004) (applying principle in summary judgment context).

In the district court, as previously noted, the State Defendants challenged only the sufficiency of Plaintiffs' pleadings; they did not challenge jurisdictional facts or introduce evidence to support their jurisdictional plea. However, Plaintiffs did attach evidence to their petition. On appeal, the State Defendants attempt to broaden their challenge to attack certain jurisdictional facts underlying Plaintiffs' alternative claim that H.B. 1's appropriation "exceeds even the extremely generous and faulty estimates provided by the Legislative Budget Board and is, according to the LBB's own calculations, in violation of Article VIII, Section 22(a)." Specifically, they attach to their brief two public records they assert conclusively establish that H.B. 1's appropriation did not exceed the spending cap as determined by the LBB: (1) the entirety of the Comptroller's April 17, 2006 "Revenue Estimate for the 79th Legislature, Third Called Session,"[19] and (2) an April 27, 2006 memo from the LBB's deputy director to the Lieutenant Governor and Speaker stating that $3.95 billion in additional appropriations could be made from general revenue "without exceeding the Article VIII, Section 22 limit."[20] The State Defendants acknowledge that these documents "were not before the trial court," but request us to take judicial notice of them, urging that the facts

---

[19] Selected portions of this document were attached as Exhibits I and J to Plaintiffs' petition, but not the entire document.

[20] As previously noted, H.B. 1 appropriated $3.825 billion.

18

stated within them are not subject to reasonable dispute and are capable of accurate and ready ascertainment from reliable public sources. *See* Tex R. Evid. 201.

Plaintiffs reply that the State Defendants are inappropriately seeking to litigate the merits of their claims in the guise of a jurisdictional challenge. Allowing them to do so, especially if allowed "to change theories and introduce evidence [on] appeal," Plaintiffs urge, is inconsistent with supreme court precedent and "fundamental notions of due process." In any event, Plaintiffs contend, the new documents "have no bearing" on whether the State Defendants complied with the spending cap.

We will address the specific question of whether we may consider the jurisdictional challenge and evidence that the State Defendants seek to raise on appeal as they become relevant to our analysis. However, the parties' respective arguments suggest that we should clarify here some broader principles governing our review. To the extent that Plaintiffs suggest that it is categorically improper to adjudicate, through a jurisdictional plea, jurisdictional issues that implicate or overlap the merits, that notion is belied by *Miranda*. *See Miranda*, 133 S.W.3d at 227-28 (regarding whether parks and wildlife department acted with gross negligence so as to waive sovereign immunity under the recreational use statute). It is also well-established that where a trial court's jurisdiction depends upon whether a state official's acts are within her constitutional or statutory authority, such as when a plaintiff alleges *ultra vires* action to avoid sovereign immunity, the trial court may sometimes be able to decide the jurisdictional issue as a matter of law based on the pleadings by construing the constitutional and statutory provisions defining the actor's authority and ascertaining whether the acts alleged would exceed that authority. *See, e.g.*, *McLane Co. v. Strayhorn*, 148 S.W.3d 644, 649

19

(Tex. App.—Austin 2004, pet. denied) (acknowledging that in determining whether declaratory judgment suit may be maintained against a state official, it was first necessary, in light of sovereign immunity principles, to construe statutes defining official's powers to "decide whether the [official] validly exercised her discretion or acted outside of her legal authority."); *cf. Director of Dept. of Agric. & Environ. v. Printing Indus. Ass'n*, 600 S.W.2d 264, 265-70 (Tex. 1980) (construing constitution to determine whether plaintiff alleged *ultra vires* action by state officials; state had raised issue via special exceptions).[21] And *Miranda* would further allow jurisdictional challenges, via its summary judgment-like process, to the existence of the alleged acts that are asserted to have been beyond the actor's constitutional or statutory authority.

Yet this does not mean that defendants and trial courts have free rein to "require[] that the plaintiff prove his case . . . at the pleading stage, before any discovery has been conducted," as Plaintiffs contend occurred here. To succeed, a defendant challenging a jurisdictional fact via a plea to the jurisdiction must satisfy the same initial burden as in a "traditional" summary judgment—conclusively negating the existence of the fact—and judgment is proper in such instance only if the plaintiff cannot present controverting evidence raising a genuine issue of material fact. *Miranda*, 133 S.W.3d at 227-28. More generally, a trial court must exercise sound discretion in

---

[21] Our decision in *Davis v. Burnam* is not to the contrary. 137 S.W.3d 325, 334-35 (Tex. App.—Austin 2004, no pet.). In relevant part, we vacated a trial court's denial of a plea to the jurisdiction that had challenged whether the plaintiff had alleged that a state agency director had acted *ultra vires*. While we characterized the issue as involving "the merits" and turning on "statutory construction" of the agency's powers, the basis for our holding was that the plaintiff had added this *ultra vires* claim only one day before a hearing on the plea to the jurisdiction related to other claims and that the agency, therefore, had inadequate notice that the trial court might rule regarding its jurisdiction over the newly-added claim, and inadequate opportunity to develop its arguments and authorities. *Id.* & n.16.

deciding whether a jurisdictional determination implicating the merits "should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable." *Id.* at 227; *see Bland*, 34 S.W.3d at 554. It follows that a trial court's decision to determine a jurisdictional issue implicating the merits at a particular preliminary stage of case development may be so arbitrary or unreasonable, given the state of the record, that it constitutes an abuse of discretion. *Cf. Davis v. Burnam*, 137 S.W.3d 325, 334-35 (Tex. App.—Austin 2004, no pet.) (vacating trial court's denial of jurisdictional plea turning on statutory construction to determine whether alleged acts were *ultra vires*; defendant had inadequate notice to brief and argue the issue).

**Political question/self-executing constitutional provision**

The State Defendants argue that the district court's dismissal of Plaintiffs' claims should be affirmed because the court lacked subject matter jurisdiction to provide a remedy for any alleged violation of article VIII, section 22. They attempt to invoke the political question doctrine and the related doctrine of self-executing constitutional provisions, each of which emanate from separation-of-powers concepts. Long recognized in Texas law, the doctrine of self-executing constitutional provisions is concerned with whether a provision confers sufficiently determinate standards to permit judicial ascertainment and enforcement:

> A constitutional provision is said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which these principles may be given force of law.

21

*Neeley*, 176 S.W.3d at 782 (quoting *Mitchell County v. City Nat'l Bank*, 43 S.W. 880, 883-84 (Tex. 1898) (quoting T. Cooley, *Constitutional Limitations* 99-100 (6th ed. 1890))). Similarly, a "political question," at least as it has been defined in the federal courts, is one that involves (1) "a lack of judicially discoverable and manageable standards for resolving it," or (2) "a textually demonstrable constitutional commitment to a coordinate political department." *Id.* at 777-78 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1963)).

The State Defendants argue that article VIII, section 22(a), by requiring that "[t]he legislature shall provide by general law procedures to implement this subsection," including a method for determining "the *estimated* rate of growth of the state's economy," embodies a "textually demonstrable constitutional commitment" of these matters to the legislature. *See* Tex. Const. art. VIII, section 22(a). And the requirement that "[i]n no biennium shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy," the State Defendants urge, does not provide sufficiently definite standards to permit judicial determination and enforcement.

The State Defendants equate article VIII, section 22(a) to the constitutional provision addressed in *City of Corpus Christi v. City of Pleasanton*, 276 S.W.2d 798, 803 (Tex. 1955). In *City of Pleasanton*, the supreme court applied the doctrine of self-executing constitutional provisions to article XVI, section 59 of the Texas Constitution, which declares that "[t]he conservation and development of all the natural resources of this State [are] public rights and duties" and requires the legislature to "pass all such laws as may be appropriate thereto." Tex. Const. art. XVI, § 59. The court held that this provision did not provide courts a basis to declare "what types of conduits

22

and reservoirs may be used for the transportation and storage of water, lawfully obtained and lawfully used" or "declare the use of certain types of conduits and reservoirs to be unlawful when the Legislature, by necessary implication, has declared them to be lawful." *City of Pleasanton*, 276 S.W.2d at 803.

The State Defendants also rely on a prior decision of this Court in which we held that the former article III, section 61 of the Texas Constitution did not confer a judicially enforceable right. *Texas Workers' Comp. Comm'n v. City of Bridge City*, 900 S.W.3d 411, 414-15 (Tex. App.—Austin 1995, writ denied). Article III, section 61 provided:

> The Legislature shall have the power to enact laws to enable cities, towns, and villages . . . to provide Workmen's Compensation Insurance . . . and the Legislature shall provide suitable laws for the administration of such insurance in the said municipalities and for payment of the costs, charges, and premiums on policies of insurance and the benefits to be paid thereunder.

Tex. Const. art. III, § 61 (repealed November 6, 2001). We held that "the question of what is a 'suitable' law is not within the power of a court to decide. By its very nature, it is a political question committed to the legislature because it calls for pure public policy decisions beyond a court's competence." *City of Bridge City*, 900 S.W.3d at 415.

Plaintiffs contend that article VIII, section 22(a) is comparable to article VII, section 1 of the Texas Constitution, and emphasize the Texas Supreme Court's jurisprudence holding that this provision is self-enforcing to the extent of prohibiting inconsistent laws and that claims under it do not present non-justiciable political questions. Article VII, section 1 provides:

23

> A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.

Tex. Const. art. VII, § 1. The supreme court has repeatedly reaffirmed that challenges under this provision to the "efficiency," "adequacy" and "suitability" of Texas's public school finance system do not present non-justiciable political questions. *See Neeley*, 176 S.W.3d at 776-80.[22] Most recently, in *Neeley*, the court assumed without deciding that the *Baker v. Carr* test applied to the Texas Constitution and reaffirmed that claims under article VII, section 1 did not present political questions. *Id.* While acknowledging that article VII, section 1 "commits to the Legislature, the most democratic branch of the government, the authority to determine the broad range of policy issues in providing for public education," *id.* at 778, the court reiterated that "[t]his duty is not committed unconditionally to the legislature's discretion, but instead is accompanied by standards." *Id.* at 776 (quoting *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex. 1989) ("*Edgewood I*")). As for whether those "standards" were capable of judicial enforcement, the supreme court stated:

> Nor do we agree with the State defendants that the constitutional standards of adequacy, efficiency, and suitability are judicially unmanageable. These standards import a wide spectrum of considerations and are admittedly imprecise, but they are not without content. . . . The judiciary is

---

[22] The supreme court did not explicitly hold that "suitability" claims under article VII, section 1 were justiciable until after our *Bridge City* decision. *Compare Neeley*, 176 S.W.3d at 776-80, *with Texas Workers' Comp. Comm'n v. City of Bridge City*, 900 S.W.3d 411, 415 (Tex. App.—Austin 1995, writ denied) (emphasizing that the supreme court's holding regarding the "efficiency" clause in *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394 (Tex. 1989) ("*Edgewood I*"), was "the only instance of which we are aware in which a court has undertaken such a task.").

well-accustomed to applying substantive standards the crux of which is reasonableness. This is not to say that the standards in article VII, section 1 involve no political considerations beyond the judiciary's power to determine. We have acknowledged that much of the design of an adequate public education system cannot be judicially prescribed. Litigation over the adequacy of public education may well invite judicial policy-making, but the invitation need not be accepted. The judiciary's choice is not between complete abstinence from article VII, section 1 issues, and being, in the State defendants' words, "the arbiter of education and policy, overseeing such issues as curriculum and testing development, textbook approval, and teacher certification." Rather, the judiciary's duty is to decide the legal issues properly before it without dictating policy matters. The constitutional standards provide an appropriate basis for judicial review and determination.

*Id*. at 778-79; *see also Edgewood I*, 777 S.W.2d at 394 ("By express constitutional mandate, the legislature must make 'suitable' provision for an 'efficient' system for the 'essential' purpose of a 'general diffusion of knowledge.' While these are admittedly not precise terms, they do provide a standard by which this court must, when called upon to do so, measure the constitutionality of the legislature's actions.").

The *Neeley* court similarly rejected the contention that article VII, section 1 was not self-executing and not susceptible to judicial action to enforce its provisions. 176 S.W.3d at 782-83. While recognizing that article VII, section 1 was not "self-executing" in the sense of mandating the specific means through which the legislature must comply with its duty under that provision, the court held that it was "self-executing" to the extent of prohibiting legislative action inconsistent with the provision:

The standards of article VII, section 1—adequacy, efficiency, and suitability—do not dictate a particular structure that a system of free public schools must have. We have stressed this repeatedly. . . . But . . . article VII, section 1 dictates what the public education system cannot be: it cannot be so

25

> inadequate that it does not provide for a general diffusion of knowledge, or so inefficient that districts which must achieve this general diffusion of knowledge do not have substantially equal access to available revenues to perform their mission, or so unsuitable that it cannot because of its structure achieve its purpose.
>
> Thus, we agree with the State defendants that article VII, section 1 does not provide the courts a basis for declaring what education or finance systems will alone satisfy its standards. But the provision is self-executing insofar as it prohibits any system that fails to meet those standards.

*Id.* at 783 (footnotes omitted). For this distinction, the supreme court relied on the rationale of *Mitchell County v. City Nat'l Bank*, 43 S.W. at 883-84. *Mitchell County* involved two sections of article XI of the Texas Constitution—section 2, which states that "[t]he construction of jails, court-houses and bridges . . . shall be provided for by general laws," and section 7, which prohibited cities and counties from incurring debt for certain projects without imposing taxes for a sinking fund to repay the debt—and article VIII, section 9, which limited the amount of certain taxes that cities and counties could impose. Tex. Const. arts. VIII, § 9, XI, §§ 2, 7. The *Mitchell County* court stated that "[i]n the sense that all laws in conflict with these prohibitions are void, section 9 of article 8 and section 7 of article 11 are self-executing; but, in so far as anything is required to be done to carry them into effect, they are not so, because they prescribe no rules by which any act could be done in the enforcement of their requirements." 43 S.W. at 882-83; *see Neeley*, 176 S.W.3d at 782 (summarizing this holding: "the constitutional provisions were self-executing only in prohibiting conflicting laws and did not preclude statutes passed to effectuate the provisions.").

We agree with Plaintiffs that the Texas Supreme Court's jurisprudence under article VII, section 1 compels us to hold that article VIII, section 22 is self-executing to the extent of

prohibiting legislative action inconsistent with its provisions, and that Plaintiffs' claims of violations do not present non-justiciable political questions.[23]  Although the legislature is delegated the authority to make laws to implement article VIII, section 22(a), this is not the sort of broad delegation to enact "laws as may be appropriate" at issue in *City of Pleasanton,* 276 S.W.2d at 803, or even the mandate to "provide suitable laws" we addressed in *City of Bridge City*.  This authority is "not committed unconditionally to the legislature's discretion, but instead is accompanied by standards." *Neeley*, 176 S.W.3d at 776-77 (quoting *Edgewood I*, 777 S.W.2d at 394).  Specifically, legislation that purports to implement the requirement that "[i]n no biennium shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy" must necessarily be consistent with those standards. *Mitchell County*, 43 S.W. at 882-83.

Although the standards of article VIII, section 22(a) "are admittedly not precise terms," *Neeley*, 176 S.W.3d at 776-77 (quoting *Edgewood I*, 777 S.W.2d at 394), they surely must be considered sufficiently determinable and enforceable by courts if, as the supreme court has held, such nebulous concepts as "adequacy," "efficiency," and "suitability" under article VII, section 1 are. In sum, article VIII, section 22(a) gives the legislature the "sole right to decide how to meet the standards set by the people" in that provision, but "the Judiciary has the final authority to determine

---

[23] In their original petition, Plaintiffs requested several declarations that would have specified particular methods by which the State Defendants or the legislature would be required to calculate the rate of growth in the state economy or the spending cap.  On appeal, Plaintiffs appear to have conceded that they would not be entitled to those sorts of declarations, but only those determining that article VIII, section 22 has been violated.

27

whether they have been met." *Id*. at 777 & n.169 (quoting *West Orange-Cove Consol. Indep. Sch. Dist. v. Alanis*, 107 S.W.3d 558, 563-64 (Tex. 2003)).

Our reasoning is further informed by the *Neeley* court's observations that non-justiciable political questions are rare, *id*. at 779-80, and that *City of Pleasanton* is the sole instance in which it has used the doctrine of self-executing constitutional provisions to preclude judicial action. *Id.* at 782-83. We are also mindful of the supreme court's observations that while the Texas Constitution does not empower the judicial branch to engage in legislative policymaking in the guise of constitutional interpretation, neither does it permit courts to avoid their duties, when called upon, to strike down laws that are inconsistent with constitutional provisions. *Id.* at 776-82. As the supreme court observed when first summoned to strike down an act of the Republic of Texas Congress:

> [W]e have not been unmindful of the magnitude of the principles involved, and the respect due to the popular branch of the government. . . . Fortunately, however, for the people, the function of the judiciary in deciding constitutional questions is not one which it is at liberty to decline. . . . [We] cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution; [we] cannot pass it by because it is doubtful; with whatever doubt, with whatever difficulties a case may be attended, [we] must decide it, when it arises in judgment.

*Morton v. Gordon*, Dallam 396, 397-98 (Tex. 1841); *see also Neeley*, 176 S.W.3d at 777 ("what this court said [in *Morton*] . . . is still true.").

Because article VIII, section 22 is self-executing to the extent of prohibiting legislative action inconsistent with its standards, which are judicially ascertainable, and because

Plaintiffs' claims that these standards have been violated do not present a non-justiciable political question, we cannot affirm the district court's order of dismissal based on these doctrines.

**Unlawful appropriation**

The State Defendants further contend that Plaintiffs lack standing and that their claims are barred by sovereign immunity because they have not, and cannot, assert a valid claim that H.B. 1's appropriation is unlawful. Plaintiffs pleaded that they have standing as "residential and business taxpayers," an allegation that we construe, in the context of their other allegations, to assert that they pay state taxes that could establish taxpayer standing.[24] The Texas Supreme Court has explained that "[i]n general, taxpayers do not have a right to bring suit to contest government decision-making because . . . governments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under review." *Bland*, 34 S.W.3d at 555 (quoting *Osborne v. Keith*, 177 S.W.2d 198, 200 (Tex. 1944)). Unless standing is conferred by statute,[25] taxpayers must show as a rule that they have suffered a particularized injury distinct from that suffered by the general public in order to have standing to challenge a government action or assert a public right. *Id* at 555-56. Texas law, however, has long recognized an important exception to this general rule: a taxpayer has standing to sue in equity to enjoin the illegal expenditure of public funds, even without showing a distinct injury. *Id.*

---

[24] The State Defendants "do not question that Hendee is a taxpayer under the facts set forth in the pleadings."

[25] Plaintiffs do not contend that the UDJA alone suffices to confer them standing as taxpayers.

Plaintiffs contend that their pleadings allege facts bringing them within this exception. The foundation of their standing theory is their contention that they have alleged sufficient facts that, if proven, would establish that H.B. 1 violates article VIII, section 22 or chapter 316 (which, they reason, would render illegal any expenditures made under the appropriation). *See* Tex. Const. art. VIII, § 6 (forbidding expenditure of state funds "but in pursuance of specific appropriations made by law").[26] For the same reasons, Plaintiffs urge that they have pleaded a valid claim of *ultra vires* action that is not barred by sovereign immunity. *See, e.g.*, *Cobb v. Harrington*, 190 S.W.2d 709, 712 (Tex. 1945) (recognizing that sovereign immunity does not bar claim of *ultra vires* acts); *McClane Co.*, 148 S.W.3d at 649.

We conclude that the district court would have abused its discretion if it dismissed on this basis Plaintiffs' claims that (1) the use of personal income as the "sole barometer" of "the estimated rate of growth of the state's economy" causes the spending caps set on that basis to permit unconstitutionally excessive appropriations, and that H.B. 1 is such an appropriation; and (2) their alternative claim that the H.B. 1 appropriation "exceeds even the extremely generous and faulty estimates provided by the Legislative Budget Board." The dispositive issues—as they have evolved on appeal—controlling whether Plaintiffs have validly pleaded each theory were not raised, briefed, or developed in the district court.

In their plea to the jurisdiction, the State Defendants contended that Plaintiffs' claim regarding the use of personal income to set the spending cap did not validly allege unlawful conduct

---

[26] The State Defendants raise several other arguments disputing whether Plaintiffs have adequately pleaded standing under the taxpayer exception. We address those arguments in the next section of this opinion.

30

because the State Defendants had complied with section 316.002 of the government code, which required the use of the personal income measure. As for whether section 316.002 itself might violate article VIII, section 22, the State Defendants did not address that claim other than to comment that "if Plaintiffs succeed in invalidating § 316.002(b)," injunctive relief (which Plaintiffs had not requested) would be "premature" because the law presumes that the State Defendants would comply with a declaration of the statute's invalidity. On appeal, in response to questions from the Court during oral argument, the parties have begun to address one aspect of a determination of whether Plaintiffs' allegations assert a valid claim that H.B. 1's appropriation is unlawful: the standard for establishing a violation of article VIII, section 22(a). The parties concur that the appropriate standard is arbitrariness, the standard that the supreme court has applied to claims challenging Texas's public school finance system under article VII, section 1. *See Neeley*, 176 S.W.3d at 783-85.[27] Yet much

---

[27] An action is arbitrary when it is taken without reference to guiding rules or principles. *Neeley*, 176 S.W.3d at 784 (citing *General Tire, Inc. v. Kepple*, 970 S.W.2d 520, 526 (Tex. 1998)). Whether a legislative enactment is arbitrary and therefore unconstitutional is a question of law. *Id*. at 785. Although this determination may rest in part upon determinations of disputed factual matters, such findings "have a limited role" in deciding ultimately the constitutional issues. *Id.*

As applied to article VII, section 1, the arbitrariness standard accounts for the discretion the constitution affords the legislature in fashioning a public school finance system satisfying the requirements of "adequacy," "efficiency," and "suitability" while recognizing the judiciary's proper role in enforcing these requirements:

> If the Legislature's choices are informed by guiding rules and principles properly related to public education—that is, if the choices are not arbitrary—then the system does not violate the constitutional provision.

> For article VII, section 1, as with other provisions, "[t]he final authority to determine adherence to the Constitution resides with the Judiciary." As we have said, "'a mere difference of opinion [between judges and legislators], where reasonable minds could differ, is not a sufficient basis for striking down legislation

31

remains to be addressed concerning how this standard would apply here. Because the parties have not had an adequate opportunity to develop these issues, the district court would have abused its discretion by dismissing Plaintiffs' claim on this basis. *See Davis*, 137 S.W.3d at 335 & n.16.

Similarly, the State Defendants did not separately challenge the district court's subject matter jurisdiction over Plaintiffs' alternative claim that H.B. 1's appropriation, even by the LBB's own measures under section 316.002(b), exceeded the spending cap. On appeal, as previously noted, the State Defendants attempt to initiate a challenge to the jurisdictional fact of whether H.B. 1's appropriation exceeded the spending limit set by the LBB, which they attempt to support with evidence they did not present to the district court. Although subject matter jurisdiction, as a general principle, may be challenged for the first time on appeal (and may be raised by an appellate court sua sponte), *see Texas Ass'n of Bus.*, 852 S.W.2d at 445-46 (considering associational standing of appellant sua sponte),[28] there are limits to this principle where the challenge concerns jurisdictional

> as arbitrary or unreasonable.'" At the same time, "[l]egislative action . . . is not without bounds." In assessing challenges to the public school system under article VII, section 1, courts must not on the one hand substitute their policy choices for the Legislature's, however undesirable the latter may appear, but must on the other hand examine the Legislature's choices carefully to determine whether those choices meet the requirements of the Constitution. By steering this course, the Judiciary can assure that the people's guarantees under the Constitution are protected without straying into the prerogatives of the Legislature.

*Id.* (footnotes and citations omitted).

[28] In such instances, appellate courts must consider the petition, construed in the pleader's favor, and, if necessary, review the entire record to determine if any evidence supports subject matter jurisdiction. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

evidence. *Miranda* indicates that where, as here, the challenge concerns a jurisdictional fact that implicates the merits, such challenges must (1) be raised in the trial court, and (2) be supported by jurisdictional evidence that conclusively negates the existence of the challenged jurisdictional fact. This standard thus "generally mirrors" a "traditional" summary judgment motion. *Miranda*, 133 S.W.3d at 227-28 (citing Tex. R. Civ. P. 166a(a)). The supreme court explained that this standard appropriately balances the competing interests of the state and claimants in cases where jurisdictional issues also implicate the merits:

> We adhere to the fundamental precept that a court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided. This standard accomplishes this goal and more. It also protects the interests of the state and the injured claimants in cases like this one, in which the determination of the subject matter jurisdiction of the court implicates the merits of the parties' cause of action. The standard allows the state in a timely manner to extricate itself from litigation if it is truly immune. However, by reserving for the fact finder the resolution of disputed jurisdictional facts that implicate the merits of the claim or defense, we preserve the parties' right to present the merits of their case at trial. Similar to the purpose of a plea to the jurisdiction, which is to defeat a cause of action for which the state has not waived sovereign immunity (usually before the state has incurred the full costs of litigation), the purpose of summary judgments in Texas is "'to eliminate patently unmeritorious claims and untenable defenses.'" *Casso v. Brand*, 776 S.W.2d 551, 556 (Tex. 1989) (quoting *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 n.5 (Tex. 1979)). By requiring the state to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to "put on their case simply to establish jurisdiction." *Bland*, 34 S.W.3d at 554. Instead, after the state asserts and supports with evidence that the trial court lacks subject matter jurisdiction, we simply require the plaintiffs, when the facts underlying the merits and subject matter jurisdiction are intertwined, to show that there is a disputed material fact regarding the jurisdictional issue. *See Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000); *Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999).

*Miranda*, 133 S.W.3d at 228.

When reviewing a summary judgment, an appellate court cannot consider independent grounds—much less summary judgment evidence—not presented to the trial court. *See, e.g.*, *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996). We believe that *Miranda* compels the same result regarding the State Defendants' attempt to attack jurisdictional facts with evidence on appeal.

*Bland Independent School District v. Blue* may also be instructive. As discussed in detail below, the case involved a school district's appeal from a denial of its plea to the jurisdiction challenging the standing of taxpayers to seek a permanent injunction against a school district's expenditures of funds relating to the construction of a school building. 34 S.W.3d at 549. In the trial court, the district had presented evidence that the building had already been constructed, which implicated the plaintiffs' standing to sue as taxpayers. The trial court had refused to consider the evidence in the belief that it was bound to consider only the pleadings, a ruling that the Texas Supreme Court later held erroneous. *Id.* at 555. In reliance on the trial court's decision not to consider the evidence, the plaintiffs had not attempted to offer contrary evidence. *Id.* On appeal, they urged the supreme court not to consider the district's evidence without giving them the opportunity on remand to have a full evidentiary hearing. *Id.* The supreme court stated that such a remand would have been appropriate if the plaintiffs' standing had been dependent on evidence they had disputed and contended was not conclusive. *Id.* However, because the plaintiffs did "not dispute BISD's evidence that construction of the school building is complete," the court proceeded to consider "whether this undisputed evidence concerning the status of the project defeats

34

the [plaintiffs'] claim of standing." *Id*. Here, Plaintiffs dispute the conclusiveness of the evidence that the State Defendants would present on appeal.

The State Defendants urge that Plaintiffs are not entitled to an opportunity to dispute the new jurisdictional evidence they seek to present on appeal—the Comptroller's revised April 17, 2006 revenue estimate and April 27, 2006 memo from the LBB's deputy director—because those documents together are conclusive proof that the spending cap was raised so as to permit $3.95 billion in additional appropriations. The State Defendants add that we are bound to take judicial notice of these documents and these "conclusive" facts because they are part of the legislative history of H.B. 1, *see Humble Oil & Refining Co. v. Railroad Comm'n of Tex.*, 85 S.W.2d 813, 814 (Tex. Civ. App.—Austin 1935, writ dism'd), and may do so even on appeal because they concern the district court's subject matter jurisdiction. We disagree. The State Defendant's argument overlooks that they challenge the existence of a jurisdictional fact—whether, as Plaintiffs allege in their alternative claim, the State Defendants exceeded the spending cap as determined by the LBB. This issue of jurisdictional fact, as we have observed, overlaps with the merits of Plaintiffs' claim. In such instances, *Miranda* instructs trial courts to employ summary judgment-like procedures to, among other things, protect plaintiffs against premature extinction of their claims in the guise of jurisdictional rulings. *Miranda*, 133 S.W.3d at 228. Regardless of what the State Defendants' new jurisdictional evidence ultimately might show, their attempt to raise their challenge to jurisdictional facts on appeal inescapably would improperly circumvent the procedural protections required by

*Miranda*.[29] We also note that an appellate court's decision to take judicial notice of a fact on appeal is generally discretionary,[30] and that appellate courts are generally reluctant to do so when such evidence has not been presented to the trial court. *See, e.g., Tran v. Fiorenza*, 934 S.W.2d 740, 742-43 (Tex. App.—Houston [1st Dist.] 1996, no writ). Thus, even if *Miranda* does not, strictly speaking, compel our holding that we may not consider the State Defendants' new jurisdictional challenge and evidence, we exercise our discretion to decline to take judicial notice of this evidence in light of our concerns that neither Plaintiffs nor the district court have had the opportunity to address this evidence. For all of these reasons, we cannot affirm, based on the State Defendants'

[29] Nor is it immediately obvious that the State Defendants' jurisdictional evidence is necessarily conclusive, though we express no opinion on that issue at this juncture. We agree with the State Defendants that, at least under their alternative claim—which assumes the validity of the LBB-set spending cap—Plaintiffs would not have a basis to "go behind" and dispute estimates validly made by the Comptroller or LBB. However, Plaintiffs could nonetheless dispute whether additional or subsequent estimates have superseded those made in April 2006. Also undeveloped is the legal basis for the State Defendants' assertions that the April 27 memo from the LBB's deputy director represents the official actions of the LBB itself. More to the point, *Miranda* contemplates that Plaintiffs have that opportunity to raise such matters in the trial court, regardless of what the jurisdictional evidence ultimately might establish.

[30] *See Martinez v. City of San Antonio*, 768 S.W.2d 911, 914-15 (Tex. App.—San Antonio 1989, no writ) (citing Wellborn, *Judicial Notice Under Article II of the Texas Rules of Evidence*, 19 St. Mary's L.J. 6, 20 (1987)). The State Defendants emphasize that this Court has previously held itself bound to a mandatory duty, even when not requested by the parties, to take judicial notice regarding administrative agency regulations published in the Texas Register or Texas Administrative Code. *Eckmann v. Des Rosiers*, 940 S.W.2d 394, 399 (Tex. App.—Austin 1997, no pet.); *see also Office of Public Util. Counsel v. Pub. Util. Comm'n*, 878 S.W.2d 598, 600 (Tex. 1994) (court of appeals erred in refusing to take judicial notice of published P.U.C. order). We disagree that these holdings concerning administrative regulations and decisions, which are akin to statutes and court cases, would logically extend to the jurisdictional facts the State Defendants seek to challenge. *See also Eckmann,* 940 S.W.2d at 399 (noting that government code requires courts to take judicial notice of the contents of Texas Register and Texas Administrative Code).

new jurisdictional evidence, the district court's dismissal of the Plaintiffs' alternative claim regarding compliance with the spending cap as set by the LBB.

However, the district court would not have erred or abused its discretion in dismissing Plaintiffs' "unlawful delegation" claim based on the record before it. Plaintiffs' pleadings regarding that claim demonstrate fatal and incurable jurisdictional defects. *See Miranda*, 133 S.W.3d at 226-27. Plaintiffs allege that the legislature violated separation-of-powers principles by improperly delegating its legislative powers over the spending cap to the LBB or its staff. *See* Tex. Const. art. II, § 1, interpretive commentary ("A settled maxim of constitutional law is that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority."). However, as our earlier discussion of chapter 316 illustrates, the only "delegation" of legislative power that Plaintiffs attack is merely an assignment of duties within the legislative branch akin to each chamber's referral of bills to committees prior to consideration before the entire chamber. The Texas Constitution not only contemplates but requires each chamber of the legislature to refer all bills to a committee, which must report the bill before consideration by the entire chamber. Tex. Const. art. III, § 37. In similar fashion, the LBB, a permanent joint committee of the Texas Legislature, Tex. Gov't Code. Ann. § 322.001(a), proposes for each chamber's consideration budget and policy recommendations regarding proposed legislative appropriations, including a draft General Appropriations Act each session, *id*. § 322.008(c); fiscal impact statements regarding other proposed legislation, *id*. § 314.001; and calculations of the spending cap. As with bills reported from other legislative committees, the ultimate legislative power—whether a bill containing an appropriation is passed, amended, or rejected—remains not with the LBB or its staff, but with each

37

respective chamber and its individual members, who can utilize several procedural mechanisms to resist passage of bills containing appropriations they believe would exceed the spending cap. *Id*. §§ 316.006, 316.008. Plaintiffs accordingly cannot allege a violation of the constitutional separation of powers on this basis.

**Other standing issues**

The State Defendants raise additional, potentially dispositive challenges to Plaintiffs' pleadings of standing. As previously noted, Plaintiffs rely on the exception to general standing requirements that permits a taxpayer to sue in equity to enjoin the illegal expenditure of state funds, even without showing a distinct injury. *See Williams v. Lara*, 52 S.W.3d 171, 180 (Tex. 2001); *Bland*, 34 S.W.3d at 555-56; *Calvert v. Hull*, 475 S.W.2d 907, 908 (Tex. 1972) (citing with approval *Osborne v. Keith*, 177 S.W.2d 198, 200-01 (Tex. 1944)); *City of Austin v. McCall*, 68 S.W. 791, 793-94 (Tex. 1902); *Terrell v. Middleton*, 187 S.W. 367, 368-70 (Tex. Civ. App.—San Antonio 1916), *writ ref'd*, 191 S.W. 1138 (Tex. 1918)). Plaintiffs contend that, because their pleadings allege that the H.B. 1 appropriation is unconstitutional and illegal, they necessarily complain of the "specific illegal expenditure" of state funds made pursuant to that appropriation. *See* Tex. Const. art. VIII, § 6 (requiring that state funds not be expended "but in pursuance of specific appropriations made by law"). In addition to their challenges to Plaintiffs' predicate allegations that the H.B. 1 appropriation is illegal, the State Defendants contend that Plaintiffs fail to allege illegal expenditures sufficient to bring them within the taxpayer standing exception. Specifically, the State Defendants urge that (1) Plaintiffs were required to plead that expenditures are being made for particular illegal purposes or ends, not merely that the amount of the appropriations authorizing the expenditures would exceed

the spending cap; and (2) the expenditures that Plaintiffs challenge should be deemed already spent.

*See Bland*, 34 S.W.3d at 556-57.**31**

Regarding the State Defendants' first argument, we disagree that Plaintiffs lack

standing to challenge "specific illegal expenditures" because they complain that a limit has been

exceeded and do not allege that the expenditures are directed specifically to unlawful purposes.

While many of the cases upholding taxpayer standing to enjoin illegal expenditures have involved

challenges to the legality of those expenditures' purposes,**32** we disagree that such facts preclude the

---

**31** The State Defendants do not suggest that Plaintiffs lack standing to challenge prospective unlawful expenditures under this exception merely because they have not yet sought an *injunction against* those expenditures, but request only *declarations that* the H.B. 1 appropriation and expenditures made under it are illegal. In fact, in their plea to the jurisdiction, the State Defendants contended that injunctive relief would be "premature" before they had the opportunity to comply with any declaration that the court might issue because "[t]he law presumes that a defendant will recognize and respect the rights declared by a declaratory judgment and will abide by the judgment in carrying out its duties." Plea to the Jurisdiction, C.R. 139-40 (quoting *Howell v. Texas Workers' Comp. Comm'n*, 143 S.W.3d 416, 433 (Tex. App.—Austin 2004, pet. denied)).

At least to the extent that Plaintiffs properly challenge the legality of future expenditures made under the H.B. 1 appropriation, we conclude that Plaintiffs would have standing to assert that claim under the UDJA without seeking injunctive relief. While the UDJA does not expand a trial court's jurisdiction or dispense with the justiciability requirements of ripeness and standing, it does provide a remedy where subject matter jurisdiction otherwise exists. Tex. Civ. Prac. & Rem. Code Ann. § 37.003(a) (West 1997) ("A court of record *within its jurisdiction* has power to declare rights, status and other legal relations . . . .") (emphasis added); *Texas Ass'n of Bus.*, 852 S.W.2d at 444. Thus, if Plaintiffs would have standing to seek an injunction to prevent expenditures that the trial court determined to be illegal, the UDJA would likewise authorize them to obtain declarations regarding the component issue of whether the expenditures were illegal. *Cf. El Paso Co. Hosp. Dist. v. Gilbert*, 64 S.W.3d 200, 202-03 (Tex. App.—El Paso 2001, pet. denied) (where plaintiffs had justiciable interest in controversy arising under section 26.04 of property code, they likewise had standing to seek relief under UDJA).

**32** *See Williams v. Lara*, 52 S.W.3d 171, 180-83 (Tex. 2001) (complaint of public funds being expended at prison in violation of Establishment Clause); *Calvert v. Hull*, 475 S.W.2d 907, 908 (Tex. 1972) (suit to enjoin funds appropriated by legislature to procure site of University of Texas of the Permian Basin on basis that conditions for appropriation were not met); *Osborne*

39

application of the taxpayer standing exception here. We see no meaningful distinction, for example,

between a taxpayer suit to enjoin expenditures under an allegedly void or illegal contract, long

permitted in Texas law, *see Osborne*, 177 S.W.2d at 200-01; *McCall*, 68 S.W. at 793-94, and a

taxpayer suit to prevent expenditures under an unlawful legislative appropriation, as Plaintiffs allege

here. In fact, state taxpayers have been permitted to sue to enjoin state expenditures based on

allegations that the expenditures would not be pursuant to a valid appropriation. *See Johnson v.*

*Ferguson*, 55 S.W.2d 153, 155 (Tex. App.—Austin 1932, writ dism'd) (challenging grant of

temporary injunction prohibiting further state highway construction contracts because there was not

---

*v. Keith*, 177 S.W.2d 198, 200-01 (Tex. 1944) ("recogniz[ing] the right of a taxpaying citizen to maintain an action in a court of equity to enjoin public officials under a contract that is void or illegal."); *City of Austin v. McCall*, 68 S.W. 791, 793-94 (Tex. 1902) (same).

Plaintiffs suggest that *Terrell v. Middleton*, the notable "chicken salad case," *see Hull*, 475 S.W.2d at 908, is closely analogous to this case and squarely supports the proposition that taxpayers may sue to enjoin state expenditures that exceed constitutional spending limits. In fact, it is somewhat unclear whether the allegedly unlawful expenditures that conferred standing upon the taxpayer plaintiff did so because the expenditures exceeded a constitutional limit or because the purposes of the expenditures were allegedly unlawful. *See* 187 S.W. 367, 372-73 (Tex. App.—San Antonio 1916), *writ ref'd*, 191 S.W. 1138 (Tex. 1918). *Terrell* involved whether the Comptroller could use state funds to pay certain entertainment bills incurred by the governor—including chicken salad from the Driskill. Although these expenditures would have violated constitutional limits on the amount of the governor's salary, the court of appeals also emphasized that the items that were to be paid by the Comptroller "were for *private and individual purposes*, and not for the public good, and the appropriation made for that purpose by the Legislature was directly in the face of article 16, § 6 of the Constitution, which commands that 'no appropriation for private or individual purposes shall be made.'" *Id*. at 372 (emphasis added). The court also noted that "a lending of the credit of the State to a Governor for his private expenses, to increase his compensation is not only a violation of the constitutional provision as to his compensation, but is in violation of article 3, § 50, of the Constitution." *Id*. at 373; *see also* Tex. Const. art. III, § 50 (prohibiting legislature from giving or lending credit of State to any person or pledging credit of State in any manner whatsoever for payment of individual's liabilities). The court's opinion concluded by stating that whenever taxes are imposed for private purposes, they "cease to be taxation and become plunder." *Id*. (quoting *Waples v. Marrast*, 184 S.W. 180, 182 (Tex. 1916)).

any legislative appropriation available for that purpose); *Terrell*, 187 S.W. at 374 (challenging appropriation of $2,000 and additional $1,500 deficiency appropriation for Governor's personal expenses). Similarly, county taxpayers have long been permitted to sue to enjoin county expenditures not properly authorized in a budget, in contravention of the Uniform Budget Act. *See Garcia v. State*, 290 S.W.2d 555, 559 (Tex. Civ. App.—San Antonio 1953, writ ref'd n.r.e.); *Guerra v. McClellan*, 243 S.W.2d 715, 717 (Tex. Civ. App.—San Antonio 1951, no writ); *see also* Act of May 21, 1931, 42nd Leg., R.S., ch. 206, 1929-31 Tex. Gen. Laws 339, *repealed by* Act of April 30, 1987, 70th Leg., R.S., ch. 149, § 49(1), 1987 Tex. Gen. Laws 707, 1306 (current version at Tex. Loc. Gov't Code Ann. §§ 111.010, .039(b) (West 1999)). We reject the State Defendants' narrow view of the taxpayer standing exception.[33]

---

[33] We also find unpersuasive the State Defendants' attempts to equate Plaintiffs' claims to those asserted in *Robinson v. Neeley*, 192 S.W.3d 904, 911 (Tex. App.—Dallas 2006, no pet.), which they cite for the proposition that "when the authority to engage in an activity is disputed, but not the legality of the action itself, taxpayers have no standing to challenge it." *Robinson* arose from the education commissioner's appointment of a board of managers to control the operations of the Wilmer-Hutchins Independent School District. After the board voted to "essentially shut down the district," a group that included a district taxpayer sued for declaratory and injunctive relief. Their petition was dismissed for want of standing, which the court of appeals affirmed. Regarding the taxpayer's standing, the court observed that "[n]owhere in appellants' active pleading or their brief do they accuse the Commissioner, the [board], or [the superintendent] of expending public funds on illegal activity [but] complain that the expenditures were made by an 'invalid' board." *Id.* at 911. The court further noted that "[a]ppellants cite no authority for the proposition that a public officer, performing his duties in good faith, is engaged in an illegal activity if his authority is in dispute." *Id.*

In an attempt to bring this case within *Robinson*, the State Defendants characterize Plaintiffs' claims as "attack[ing] only the process by which the funds were allocated." Plaintiffs' claims are clearly not so limited. They challenge expenditures claimed to be unlawful because they are being made pursuant to allegedly unconstitutional or unlawful appropriations. At most, *Robinson* might have implications for Plaintiffs' standing to assert their claims that chapter 316 unlawfully delegates legislative power to the LBB, a claim that we have already held is barred by lack of standing and sovereign immunity.

Turning to the State Defendants' second argument, it is well-established that taxpayers have standing only to challenge *prospective* state expenditures, but do not have standing to complain of public funds that have already been spent. As the supreme court has explained:

> When a taxpayer brings an action to restrain the illegal expenditure . . . of tax money he sues for himself, and it is held that his interest in the subject-matter is sufficient to support the action; but when the money had already been spent, an action for its recovery is for the [taxing entity]. The cause of action belongs to it alone.

*Hoffman v. Davis*, 100 S.W.2d 94, 95 (Tex. 1937); *see Bland*, 34 S.W.3d at 556-58. The State Defendants assert that the expenditures authorized under the appropriations in H.B. 1 "have essentially already been spent." They apparently mean this in a functional rather than literal sense. The State Defendants urge that "schools across the state have relied on this funding in planning their yearly budgets as though they have been received and placed in permanent use," and that "[t]o reverse the appropriation would upset the settled expectations of the district and their employees." The State Defendants rely on an extension of the principles applied in *Bland*.

In *Bland*, taxpayers sued to enjoin a school district from making payments under what they contended was an invalid lease-purchase agreement with Citicorp. The district had entered into the agreement to help finance the construction of a new high school. By the time of suit, the new building had already opened, the district had paid the contractor in full, and the only obligation that remained was for the district to make semiannual loan repayments to Citicorp through 2011.

42

34 S.W.3d at 549-50.  Under these circumstances, the supreme court held that the taxpayers lacked standing to sue the school district to enjoin the future loan repayments.  The court explained:

> We are not inclined to extend the exception to taxpayer standing to include the Blues' suit.  The jurisprudential justification for taxpayer suits to enjoin performance of illegal agreements is that the interference such suits pose to government activities is slight in comparison to the protection afforded taxpayers from preventing the culmination of illegal agreements made by public officials.  But the balance in costs and benefits shifts significantly once the governmental entity has received all that it bargained for and must simply pay for it.  We need not decide here whether a governmental entity's receipt of something less than full performance under an allegedly illegal agreement is enough to preclude a taxpayer suit to prohibit future performance.  When all that remains is a school district's repayment of a loan for work completed, allowance of a taxpayer action to prohibit such repayment threatens a substantial interference with governmental actions.  The Blues' action not only threatens BISD's already substantial investment in its high school, and what by now are the settled expectations of other taxpayers in the district who are also served by the high school, but should the action succeed on the merits, it would signal increased risks to lenders and others in dealing with governmental entities.  The potential for disruption of government operations is too great to allow a taxpayer with no special injury distinct from the general public's to sue to prohibit the government from paying for goods and services it has already received and placed in permanent use.

*Id.* at 557-58.  The State Defendants urge that "the school districts and teachers, just as the building contractor in *Bland*, have ordered their operations based on an expectation of payment from the State," that "[t]o deprive teachers of salary increases and school districts of money for their operating budgets midway through the year is precisely the 'disruption' the *Bland* Court sought to avoid," and that we should conclude that "the money is, as a matter of law, already spent."

Unlike the Bland school district, however, the State Defendants have not developed an evidentiary record that might support such a conclusion.  As previously noted, they did not present evidence in support of their plea to the jurisdiction, and rely entirely upon broad, unsupported

assumptions about the effect of H.B. 1 on Texas school districts. Moreover, this legal theory was not presented to the district court, and the parties have only begun to address it on appeal. Especially under these circumstances, we are reluctant to adopt the State Defendants' proposed extension of *Bland*'s rationale. *See Davis*, 137 S.W.3d at 334-35 & n.16; *see also Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.). Given the state of the record and the law, this argument does not provide us a basis for affirming the district court's order.

**Issues raised sua sponte**

*Associational standing*

While the State Defendants have not separately challenged the associational standing of C.L.O.U.T., we must consider that issue sua sponte. *See Texas Ass'n of Bus.*, 852 S.W.2d at 445-46. An association has standing to sue on behalf of its members if: (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id.* (adopting the test from *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). We construe Plaintiffs' allegation that C.L.O.U.T. would have standing as a state taxpayer as an assertion that its members would have individual standing to sue as taxpayers, thus addressing the first element of the associational standing test. However, Plaintiffs' pleadings do not address the remaining elements, nor is there evidence establishing these elements in the attachments to their pleadings. *See id.* But because Plaintiffs' pleadings do not affirmatively

44

negate these elements but merely fail to address them, Plaintiffs are entitled to the opportunity to amend. *See Miranda*, 133 S.W.3d at 226-27; *Elgin*, 191 S.W.3d at 272.

### The concurrence's "ripeness" concern

Finally, the concurrence would decline to address any issue in this case other than those concerning the claim alleging unconstitutional delegation of powers. The stated basis is that the other claims are not "ripe for decision" and that a "fuller ventilation of pleadings, evidence, and briefing in the district court" would be needed to avoid an advisory opinion. We do not view ripeness as an issue in this case. Ripeness concerns whether, at the time a lawsuit is brought, the facts have developed sufficiently such that an injury has occurred or is likely to occur, rather than being contingent or remote. *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998). It is a requirement of subject matter jurisdiction. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000). If the State Defendants have acted in a manner so as to violate the spending cap, as Plaintiffs allege, those actions have been completed and Plaintiffs' claims are ripe. We also note that none of the parties have suggested that ripeness is a problem, and that the remedy the concurrence proposes—remand rather than dismissal—is inconsistent with the existence of a ripeness defect. *See id.* at 853.

The concurrence's reference to a "fuller ventilation of the pleadings, evidence, and briefing" may express a concern that there is a problem here with the State Defendants raising their jurisdictional complaints through the procedural device of a plea to the jurisdiction without opting for some other device like a summary judgment motion. Similar concerns were voiced by the dissenting justices in *Miranda*, but their views did not carry the day. *See id.* at 234, 235-36 (Jefferson, C.J., dissenting); *id.* at 239, 239-45 (Brister, J., dissenting). The concurrence may intend

its comments as an invitation to the supreme court to revisit *Miranda*. If so, it would seem more direct to simply say so. In any event, as an intermediate appellate court, we are bound to follow *Miranda* until the supreme court reverses or modifies that decision. *Petco*, 144 S.W.3d at 565. To the extent the concurrence expresses concerns that issues have been raised for the first time on appeal without the development of an adequate record, we have noted those issues and have remanded them for further proceedings.

## CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of Plaintiffs' claim alleging unconstitutional delegation of legislative powers for want of jurisdiction. However, to the extent that Plaintiffs' remaining two claims seek declarations that future expenditures under H.B.1's appropriation are unconstitutional or illegal, the district court erred or abused its discretion in dismissing those claims based on the record before it, and we reverse those portions of the district court's judgment. Additionally, we hold that, while Plaintiffs failed to sufficiently plead the associational standing of C.L.O.U.T., Plaintiffs are entitled to leave to amend to address that defect.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop;
      Concurring Opinion by Justice Patterson

Affirmed in part; Reversed and Remanded in part on Motion for Rehearing

Filed: May 25, 2007

46